THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* FRANKLIN NATIONAL BANK OF FRANKLIN SQUARE, Defendant.

Supreme Court, Special Term, Nassau County, May 29, 1951.

*Nathaniel L. Goldstein, Attorney-General (Irving L. Rollins* of counsel), for plaintiff.

*Charles P. Grimes* for defendant.

CUFF, J. The question before this court is the constitutionality of a statute of the State of New York. By means of a properly instituted proceeding, the New York Attorney-General, in the name of the People of the State of New York, seeks an injunction against defendant, the Franklin National Bank of Franklin Square, Nassau County, New York, a corporation organized and existing under the National Bank Act of the United States, restraining it from using the words "saving" or "savings" in its publicity and from holding itself out as a savings bank. Plaintiff bases its suit upon subdivision 1 of section 258 of the New York Banking Law, which reads as follows:

"No bank, trust company, *national bank,* individual, partnership, unincorporated association or corporation other than a

savings bank or a savings and loan association shall make use of the word ' saving ' or ' savings ' or their equivalent in its banking or financial business, or use any advertisement containing the word ' saving ' or 'savings,' or their equivalent in relation to its banking or financial business, nor shall any individual or corporation other than a savings bank in any way solicit or receive deposits as a savings bank; but nothing herein shall be construed to prohibit the use of the word ' savings ' in the name of the Savings and Loan Bank of the State of New York or in the name of a trust company all of the stock of which is owned by not less than twenty savings banks. Any bank, trust company, national bank, individual, partnership, unincorporated association or corporation violating this provision shall forfeit to the people of the state for every offense the sum of one hundred dollars for every day such offense shall be continued." (Emphasis supplied.)

The complaint alleges: that defendant is a national bank organized and existing under the National Bank Act (U. S. Code, tit. 12 § 21 *et seq.*); that subdivision 1 of section 258 of the New York Banking Law prohibits defendant from using " saving " or " savings " or their equivalent in its business or in soliciting or receiving deposits as a savings bank; that since 1947, defendant has been using " saving " and " savings " in its business; that it has solicited accounts by forms of publicity in which it has used the words " saving " and " savings "; that such use of those words was calculated to and did lead the public to believe that defendant was a savings bank " with all attendant safeguards and benefits " (par. 6); that the use of " saving " and " savings ", " as aforesaid ", violated said subdivision 1 of section 258 of the New York Banking Law; that although the Banking Department demanded that defendant desist using those words, defendant refuses to do so; that plaintiff has no adequate remedy at law. Plaintiff demands a permanent injunction against defendant restraining it from using the words " savings " or " saving ": (1) in its advertising; (2) in its banking or financial business, and (3) as it holds itself out as a savings bank, by the use of a sign, or in its soliciting or receiving of deposits.

The answer admits: that defendant exists by virtue of the laws of Congress (U. S. Code, tit. 12, § 21 *et seq.*); that it is not authorized to do business or hold itself out as a savings bank; that it has been using " saving " and " savings " in its business since 1947 to solicit savings accounts; that it has

refused to discontinue its use of those words, although the New York Banking Department has demanded that it desist; that in its use of those two words, it did not try to lead the public to believe that it was a savings bank, nor does the public so believe. For a complete defense, defendant alleges that subdivision 1 of section 258 of the New York Banking Law is unconstitutional and void insofar as it purports to relate to defendant and national banks because: (a) it conflicts with the Constitution and laws of the United States; (b) it unduly interferes with and hinders the operations of national banks and defendant, frustrating them in accomplishing the purposes for which they were organized, and (c) it discriminates against defendant and national banks, handicapping them substantially in their competition for savings deposits with savings banks and savings and loan associations.

The allegations in the complaint charging defendant with fraudulently simulating a savings bank and fraudulently holding itself out as a savings bank, were wholly unsupported by evidence at the trial. Defendant offered proof that when its bank was remodeled, the architect and builder were instructed to erect a building which resembled not a savings bank, but a department store and that was done (717). Those charges, I find on the evidence, were completely unfounded; they are dismissed.

The issue at bar is not one of wrongdoing. The Attorney-General seems to acknowledge that by not seeking to recover the penalty of $100 a day which subdivision 1 of section 258 provides for its violation. This case tests the power of the State to legislate as it has (Banking Law, § 258, subd. 1) with relation to national banks. The Attorney-General believes it has that power, while defendant is convinced that it has not.

Defendant has openly employed the words " saving " and " savings " as it publicizes the fact that it may receive from the public " savings deposits " in the belief that the State has no control over its use of those words. The defendant relies upon certain provisions found in the Federal Reserve Act, which read in part as follows: national banks may " continue hereafter as heretofore to receive time and savings deposits and to pay interest on the same, but the rate of interest which such association may pay upon such time deposits or upon savings or other deposits shall not exceed the maximum rate authorized by law to be paid upon such deposits by State Banks or trust companies organized under the laws of the State in which such association is located." (U. S. Code, tit. 12, § 371.)

I will treat with the evidence adduced at the trial. (Numerals in parentheses refer to the stenographer's minutes.)

The proof offered by plaintiff need not be detailed, because defendant admits all of the facts upon which plaintiff rests its case. It challenges only the motives ascribed by plaintiff that defendant sought to represent itself as a savings bank. Defendant offered proof to negative that deception charge in the complaint. I admitted that evidence (although no proof of intent to deceive had been submitted by plaintiff) only because plaintiff proved and defendant admitted that defendant used the words "savings" and "saving" in its publicity, and I felt that defendant was entitled to show that its motives in so doing were marked by good faith. I have disposed of the fraud angle of this litigation; it will not again be referred to.

Returning to the subject of evidence offered by defendant, several presidents and other officers of national banks, including Arthur T. Roth, the president of defendant bank, testified. The experience and long service of these men in the banking world were not questioned. They said compositely that deposits in national banks were of two types — demand and savings; that the latter, interest-bearing deposits, were received, recorded and handled through a separate department of the bank; that the demand accounts were the usual deposits received by any commercial (as distinguished from savings) bank; that savings deposits were indispensable to the maintenance of their respective banks (728–729) that they (except defendant since 1947) refrained from using the words "savings" or "saving" in their business, unwillingly, out of deference to the prohibition contained in subdivision 1 of section 258 of the New York Banking Law (152, 154, 210, 217); that instead of those words they used, perforce, the terms "thrift", "compound interest" and "special interest" in their signs, records (deposit slips and pass books) and publicity in describing their savings department and in making known that they had the legal right to receive savings deposits (152, 210, 236); that having to use those substitutes hampered them in attracting savings deposits (121, 210, 211, 213, 238); that they rated the handicap accordingly imposed upon them as "definitely handicapped" (151) "stumbling block" (226) "considerable handicap" (239, 242), "detrimental" (239) "tremendous" (236) and similarly; that there was only one savings bank — the Roslyn Savings Bank — in Nassau County; (this court takes judicial notice of the fact that that bank is not centrally located in Nassau County;

nor is it in or reasonably near any of the larger business or congested centres and is rather inaccessible thereto by means of transportation except automobile).

To continue the résumé of the testimony of defendant's witnesses, they testified that the said Roslyn Savings Bank advertised to no great extent; that New York City savings banks (Nassau County is adjacent to New York City) and its savings and loan associations, as well as Nassau County savings and loan associations, advertise extensively (209) and aggressively for savings deposits through the media of newspapers, direct mail, periodicals, radio and other sources, putting defendant and national banks at a disadvantage in the competition for savings deposits because they emphasize the word " savings " (210); that demand deposits compare with savings deposits in their respective banks as follows: John R. Evans, president of the First National Bank of Poughkeepsie for ten years, a banker of twenty-seven years (139–141) stated that 40% of the total deposits were savings (161); Augustus B. Weller, a banker for twenty-nine years, president for seventeen years of Meadowbrook National Bank with two branches in Nassau County, testified that in 1934 the savings accounts totaled twice the demand accounts (215) while currently, the demand accounts are $15,000,000 as compared with savings accounts of $12,000,000 (219); that that ratio (about five to four demand over savings deposits) has been maintained in recent years (219–220); William H. Abel, president Central National Bank of Mineola (although only recently made president, Mr. Abel had been executive vice-president for five years and affiliated with the bank for twenty-one years) testified (233) that prior to 1950 demand deposits were $4,000,000, savings $3,000,000 (244); Mr. Roth, president of defendant, testified that from 1941 to 1948 savings deposits exceeded demand deposits (726) but since 1948 the reverse is true, to wit: 60% demand, 40% savings (738); John J. Keuthen, president of Wheatley Hills National Bank since 1936 testified that if questioned his answers would have been substantially the same as the other bank officials with the modification that whereas they state that their savings deposits totals have increased in recent years, his bank has not enjoyed that condition but on the contrary, since 1948, his savings deposits have decreased (259).

The cross-examination of the bank officials did not alter the figures given or opinions expressed. Plaintiff's counsel in each instance, developed the point that the bank of which the witness

was an officer bettered its deposit position progressively in recent years. But that development, the witnesses said, was not peculiar to Nassau County or even New York State. (153, 154, 221, 222, 226, 251). Inflation, I would say, could be a contributing factor to that condition. I do not think that that general increase in deposits in banks bears upon the problem at bar.

It was stipulated that the testimony of two other bank officials, who were in the courtroom, if called to the stand, would have been substantially the same as that given by the bank officials who had already testified, with the reservation that plaintiff was not conceding the correctness or truth thereof.

Mr. Evans (First National Bank of Poughkeepsie) made the important disclosure that his bank derived more profit from savings deposits than it did from demand deposits (161).

Defendant also introduced evidence concerning a sample poll to show the public understanding of the following terms: " savings ", " thrift ", " compound interest ", and " special interest " as they relate to bank accounts (278). The object of the defense in introducing this evidence was to demonstrate that the term " saving account " is well understood by the public; that when disposed to open a bank account, the public reacts to the power of suggestion which the word " savings " generates and turns to the savings bank with its business; that the three terms which defendant and other national banks are forced in their publicity to substitute for " savings " are not well understood and do not attract depositors in anything like the numbers that the word " savings " does.

This poll was planned and executed under the auspices of Hofstra College, a well-known and highly regarded institution of higher learning. with 3,800 students studying the arts, sciences, etc., located at Hempstead, Nassau County, New York. Although defendant paid for the services rendered, the college was actually retained by the Nassau Clearing House Association (277), an organization consisting of all except a few of the Nassau County banks, which serves the common interests of its members (203, 204). The work of the poll was assigned to the pyschology department of Hofstra. Its planning and setting up came under the jurisdiction and guidance of Matthew Chappell, professor of psychology at Hofstra and chairman of the department of psychology (278). He worked continuously on the task from beginning to end. His experience, education and knowledge are important in appraising the evidentiary value,

if any, to be ascribed to the poll, because he was the key figure. His history, appearance and manner indicate that he is a highly educated person; he has spent much of his life in the educational field, which has included sampling of public opinion; his work has made him a diplomat of the American Board of Examiners in professional psychology (281); while teaching at Columbia University of New York City, he engaged in research work in the field of "public opinion and mass buying behavior" and since 1938 has continued that study (264–265); he worked about two years (1938–1940) with Psychological Corporation in the market and social research division, making use of polling techniques in business and industry; he was employed (1940–1943) by C. E. Hooper, Inc., the firm which conducts the so-called " Hooper Rating " polls; he maintained his own office (1943–1947) as a consultant, conducting polls for business and industry (265); he wrote books on psychology and collaborated with Mr. Hooper, afore-mentioned, in writing a book entitled " Radio Audience Measurement " (266); since 1938 he has actively participated in from 50 to 100 polling activities to ascertain the public mind on different subjects (269).

Mr. Chappell was aided, as his immediate assistant, by Richard Brumbach, a professor of Hofstra's psychology department (560) and an associate director of its psychological workshop (561). He had experience relating to polls—their planning, execution and analyses (1945–1950) with a research company (562–563). The field workers were senior students at Hofstra and the others who collaborated on the poll were of its faculty. All persons who participated were paid for their services (644).

This poll is known in the art as " probability sampling " (292). The testimony reveals that it was meticulously planned, executed and analyzed. (266, *et seq.*). The objective of those who set it up was to query adults residing in Nassau County without *any person* exercising judgment in the selection of those to be interviewed (276, 292). The identities of the interviewees were arrived at solely by a mathematical process (289). The result was a strictly random selection of them (276). By the processes adopted, considered the best method in the sampling art (277), all human judgment in the choice of interviewees — which may control the results of a poll (294) was eliminated (237). One of the objectives of the poll — and an important one — was to afford to every adult member of the population of Nassau County, an equal chance, with all other adults, of becoming an interviewee (289). I find that that

ambition was closely approached by reason of the careful, intelligent, unbiased application of those in charge. The same kind of unprejudiced and careful methods, which marked the planning and supervision, were pursued in the actual interviewing (288, *et seq.*, 423–440). Mr. Chappell knew that defendant paid the expenses for the taking of the poll (372) but he did not know that the poll was to be used in a law suit until after the work had been completed and the poll and its results had been presented to defendant (646). Not only those who planned and supervised the poll testified but also two of the interviewers were witnesses (423–440). Upon defendant's counsel's statement that he had eighteen other workers (interviewers) in court ready to testify, a stipulation was entered into by counsel that if the others (the eighteen) testified, that their testimony would be substantially the same as the two who had testified without plaintiff's conceding the accuracy or truth of same (441).

The poll produced the following results: only 15% *did not know* the meaning of the term " savings account ", while 53.3%, 62.7% and 52.7%, respectively, *did not know* the meaning of the terms " compound interest account ", " special interest account " and " thrift account ". Only 19.5% gave an accurate statement as to the meaning of " thrift account ", 21.4% as to " special interest account " and 40.8% as to " compound interest account ". In this compilation, full credit for accuracy was given to answers to the effect that the meaning of the substitute terms was the same as " savings account ".

Without regard to actual percentages, the answers develop the point which this court has appreciated all along by reason of common knowledge, viz: that the public understands the meaning of the term " savings account ", for what it really is, far better than it understands the meaning of any of the substitute terms. I am also satisfied, based upon all the proof herein and judicial notice, that the word " savings ", when used with the word " account " in relation to a bank, provokes a much stronger appeal to the eye and understanding of the public than do the substitutes, when placed before persons disposed to open an interest-bearing bank account.

Polls, as evidence, are not controlling, of course. Many are misleading; valueless.

The learned deputy attorney-general vigorously opposes the consideration or even the admission of the poll evidence, as hearsay and not within any exception to the well-known rule. Both sides have briefed the question. The use of polls as a

test of public opinion by business, newspapers, periodicals and others is growing; already it is widespread (295). There is no doubt that that testimony which is usually called " hearsay " has formed part of the proof at bar. The Attorney-General argues that the answers of those interviewed as reported by the interviewers, upon which the poll rests for its usefulness, in particular, are pure hearsay. On that point Jerome Prince in his recent (1948) revision of Richardson on Evidence (7th ed.) calls that kind of proof original evidence. He says: " Where the mere fact that a statement was made, as distinguished from its truth or falsity, is relevant on a trial, evidence that such statement was made is original evidence and not hearsay." (§ 246.) This proffered proof (the answers) is testimony that the interviewees made the answers to the questions which the witnesses swear they asked them. It is no more than that. A court accepts or rejects in whole or in part *as a fact* that answers were made as reported by the witnesses, depending upon the reliance that the court places on the testimony of the witnesses. The value of the answers as evidence is something else. But that the answers were made can be a fact. The weight to be given to the answers would depend upon the poll itself. That returns us to the question of whether the poll proof should be received in evidence at all.

A party endeavoring to establish the public state of mind on a subject, which state of mind can not be proved except by calling as witnesses so many of the public as to render the task impracticable, should be allowed to offer evidence concerning a poll which the party maintains reveals that state of mind. The evidence offered should include calling the planners, supervisors and workers (or some of them) as witnesses so that the court may see and hear them; they should be ready to give a complete exposition of the poll and even its results; the work sheets, reports, surveys and all documents used in or prepared during the poll taking and those showing its results should be offered in evidence, although the court may desire to draw its own conclusions. In this trial the learned counsel for defendant adduced proof of the kind to which I have just referred. I think that the proof as to the poll should be received in evidence. I also am satisfied that the conclusions drawn therefrom are worthy of some consideration. Plaintiff's objections to the admission of this proof are overruled.

There is a difference between savings banks and commercial banks including national banks (*Bank of Redemption* v. *Boston,*

125 U. S. 60). The savings bank has no stockholders. It is owned, if owned at all, by the depositors; total amount that each depositor may deposit is limited; its officers are their employees whom they appoint to receive and invest their deposits which are to be returned to them with the earned interest upon reasonable demand. There are no profits, as such. Profits, if any, ultimately are returned to the depositors in the form of interest. The investments made by their officers are circumscribed. They may make no commercial loans (loans on unsecured notes or notes secured by personal property other than " legal investments "); the amounts of their mortgage loans on realty are surrounded by statutory restrictions referable to the appraised value of the pledged realty, its location, the nature and age of the improvement thereon, amortization arrangements, duration of loan and stability of borrower (Banking Law, § 235, subd. 6).

The commercial (national) bank is owned by its stockholders. Its officers are the employees of the board of directors, who in turn are the elected representatives of the stock. Those officers are expected, in managing the bank, to produce profits, which go to the stockholders in the form of ordinary dividends. A commercial bank may make, in the exercise of the sound judgment of its officers, unsecured loans and loans secured by personalty, which may even be merchandise. There is no limit upon the total amount it may receive from each depositor. It may provide money on mortgage loans like the savings bank based upon the appraised value of the pledged realty, but there are not the other rigid restrictions which are imposed upon savings banks (U. S. Code, tit. 12, § 371). While national banks receive and record their savings deposits separately from their demand deposits, both are pooled and provide one working fund. Thus savings deposits control as much as demand deposits, the volume of lending and investing in which national banks indulge.

It has been said that the savings bank is a semipublic institution; that the State in its wisdom seeks to encourage those who will save, particularly in small amounts; that the State has furnished a haven for the thrifty. I do not wish to cast the slightest reflection upon commercial banks and their stability when I say that the legislation with respect to savings banks enacted by this State over the years was unmistakably intended to render the savings bank as safe and sound as laws could, to the end that those small depositors, encouraged as I have said to save, would run the least possible risk of losing their funds, and, incidentally, would receive as much interest as safety would

permit. The powers and discretion of the officers of savings banks are indeed narrow and circumscribed.

The New York State Legislatures, enacting laws from time to time, were always seeking to protect deposits in savings banks, it would seem, solely for the benefit of the depositors, to assure each depositor as far as laws could assure, that his or her deposit would always be available upon reasonable demand. That legislation, however, was enacted and the decisions in harmony therewith were written before the National Government insured bank deposits in *all banks* — Federal and State — up to $10,000 (Public Law 797, ch. 967, enacted Sept. 21, 1950). Ten thousand dollars is the limit which a savings bank may accept from any one depositor (L. 1951, ch. 592).

As the matter stands today, all deposits in national banks are insured by the United States Government in exactly the same way as deposits in savings banks are insured, by the United States Government. In the light of this development, has not one of the principal reasons for the studied protective legislation referable to savings banks, including subdivision 1 of section 258, and the protective attitude of the courts in their reflective decisions become academic? Is that arm of State protection to reassure bank depositors needed any more?

Prompted by its traditional zeal to clothe its savings banks with the ultimate in known safeguards against financial loss by depositors the State of New York, due to its more recent enactment (§ 258, subd. 1) has extended itself to the point where it stands accused by the defendant herein of attempting to preempt certain fields of the banking business essential to the National Government in maintaining its system of banking (U. S. Code, tit. 12, § 371) and by this suit the State seeks to judicially eject from those fields an important cog in that system, albeit a creature of the United States Government — the national bank.

Giving appropriate consideration to the evidence adduced herein by defendant, which proof is either not disputed or not successfully challenged, it is evident that subdivision 1 of section 258 of the New York Banking Law and section 371 of the Federal Reserve Act cannot be read together in harmony. There is a violent conflict of legislative authority. We are obliged to ascertain the extent of that clash and the damage. Is there impairment, hampering, embarrassment or restriction exerted upon national banks by the New York statute, as they endeavor to achieve the objectives which Congress contemplated

for them? If there is, that is a fatal legislative transgression by a State law (*First Nat. Bank* v. *Commonwealth*, 9 Wall. [U. S.] 353, 362; *Davis* v. *Elmira Sav. Bank*, 161 U. S. 275, 283; *McClellan* v. *Chipman*, 164 U. S. 347; *Waite* v. *Dowley*, 94 U. S. 527, 533).

In specific terms, what does the New York statute seek to accomplish? The answer to that question will expose the inroads of the State statute, if any, upon the Federal grant of power to national banks to receive " savings deposits ". The statute may be divided into three, as far as this litigation goes, parts. The first part provides that " No ⁂ ⁂ ⁂ national bank ⁂ ⁂ ⁂ shall make use of the word ' saving ' or ' savings ' or their equivalent in its banking or financial business ". The second part provides that no national bank shall make use of the equivalent of " saving or savings " *in relation to* its banking or financial business. The third part forbids national banks " in any way [to] solicit or receive deposits *as a savings bank* ". (Banking Law, § 258, subd. 1; italics supplied.) I will discuss the third part first. A national bank is not a savings bank. Nevertheless, Congress has granted it the power to solicit and receive " savings deposits " (U. S. Code, tit. 12, § 371). Obviously any national bank (the defendant is one) availing itself of that power, will provide space and facilities within its walls where such deposits may be made by the public and be received by the bank. That particular part of the bank of necessity will give off an air of sanctuary where savings are to be banked. To that extent the national bank would assume some of the attributes typical of an institution where savings are ordinarily deposited. I cannot perceive how such a situation could be avoided, if the national bank is to receive " savings deposits ". Could it be that the authors of subdivision 1 of section 258 of the New York Banking Law intended to render that inevitable situation a violation of that law and to subject the national bank which, perforce gave it expression, to the prescribed penalties? The provision " nor shall " a national bank " in any way solicit or receive deposits as a savings bank " (§ 258, subd. 1), I consider refers to a national bank simulating a New York savings bank for purposes of deception (*People* v. *Binghamton Trust Co.*, 139 N. Y. 185, 190). The element of deception abhors this litigation, because as I have pointed out above, there was a complete failure of proof in plaintiff's case with respect thereto. Therefore, the " third " part of subdivision 1 of section 258 may be disregarded.

But the " first " and " second " parts of the statute are different. To begin with, defendant admits violating those provisions. I find that those parts of the law apply with directness and force to this case. As far as the issues herein presented are concerned, however, the provisions of the law which I have designated " first " and " second " parts may be considered together. The language would seem to be restrictive, confining its prohibitions to those occasions only when a national bank is engaged " in its banking and financial business " (§ 258, subd. 1), but when the nature of the provisions is considered, the prohibitions are actually all inclusive, because only when a national bank is engaged " in its banking and financial business " does it receive " savings deposits " and does it have reason to use the forbidden words " saving " and " savings ". Inferentially, subdivision 1 of section 258 forbids a national bank, *inter alia*, to use those words or their equivalent:

(1) in its display of signs on its own premises:

 (a) even to indicate its right to receive " savings deposits ";

 (b) even for directional purposes to guide its customers to the place where " savings deposits " may be received;

 (c) even to designate the proper window for such depositing;

 (d) even to print the words " savings deposits " on its deposit slips and pass books;

 (e) even to print or write those forbidden words in any of its accounting records (see Defendant's Ex. PP, which requires national banks to use the word " savings " in those reports to the Comptroller of the Currency);

and

(2) in any form of its advertising or its publicity, which of course, includes oral as well as written, as long as the utterance relates to its banking or financial business.

Other similar inferential injunctions imposed by the law in question could be cited. Those enumerated surely *hamper* defendant in the exercise of the power bestowed upon it by Congress as it exerts " such incidental powers as shall be necessary to carry on the business of banking " (U. S. Code, tit. 12, § 24). Receiving " savings deposits " is a part (the uncontradicted evidence indicates that it is a very important part) of defendant's banking business. The evidence also reveals that defendant

could not function without " savings deposits " (728, 729).
Therefore, receiving such deposits becomes a necessary element
in enabling defendant to prosecute its banking business and
to render the service to the United States Government in main-
taining its system of banking and to the public which Congress
intended it should. If receiving " savings deposits " is a neces-
sary part of defendant's banking business, crippling obstruc-
tion placed in defendant's way amounts to *impairment* of
defendant's banking business. Likewise, the prohibitions men-
tioned above, viz: no signs, no printing, no advertising and no
publicity, with the words " saving " or " savings " therein,
*embarrasses* defendant and certainly *restricts* it " tremen-
dously " (236) in obtaining " savings deposits ". (*First Nat.
Bank* v. *Fellows,* 244 U. S. 416; *Fidelity Nat. Bank & Trust Co.*
v. *Enright,* 264 F. 236, 239; Paton's Digest (1940), p. 645).

To deny to defendant the right to invite the public by all
proper means of expression at its disposal, to make " savings
deposits " with it, is to curtail the power to receive such accounts,
to reduce its effectiveness as an agency handling that kind of
financing — in short, to defeat one of the main purposes for
which it was created by Congress.

Under such conditions, one law or the other must give way.
The State law must yield to the Federal law — the supreme
law of the land (U. S. Const., art. VI).

Commencing with *McCulloch* v. *Maryland* (4 Wheat. [U. S.]
316), the Supreme Court, as well as other courts, has consistently
held that a State statute may not defeat in whole or in part
the objectives expressed or implied in an act of Congress which
is constitutional. The facts in some of those cases are: In the
above case, the State vainly sought to impose a tax upon a branch
bank of the Bank of the United States. In *Missouri ex rel.
Burnes Nat. Bank* v. *Duncan* (265 U. S. 17) the State offense
was legislation which forbade the appointment of national banks
to serve as testamentary executors, while State trust companies
competing with national banks, were authorized to serve as such
executors. In *First Nat. Bank* v. *California* (262 U. S. 366),
the invalidated State law provided for the escheat to the State
of dormant deposits in a solvent national bank.

A quotation from *Easton* v. *Iowa* (188 U. S. 220) typifies the
attitude of the Supreme Court and provides a most obvious
reason for its viewpoint. The court said: " That legislation
[The National Bank Act] has in view the erection of a system
extending throughout the country, and independent, as far as

powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the States." (P. 229.) That decision also held that Congress " having power to create a system of national banks, is the judge as to the extent of the powers which should be conferred upon such banks, and has the sole power to regulate and control the exercise of their operations ". (P. 238).

To continue with examples of State laws invalidated for interference with Federal instrumentalities, in *Fidelity Nat. Bank & Trust Co.* v. *Enright* (264 F. 236, *supra* [U. S. Dist. Ct., W. D. Mo., 1920]), the voided State law forbade a national bank to use the words " trust " or " trust company " in its advertising, where the fact was that the word " trust " was part of the national bank's name; the name having been approved by the Comptroller of the Currency according to the National Banking Act.

I consider that I have cited a sufficient number of varying, as to the nature of the interferences, cases to demonstrate the state of the law with regard to particular situations, some of which, in their facts, approximate the facts in this case (*Fidelity Nat. Bank & Trust Co.* v. *Enright, supra,* for instance).

There is no doubt that creatures of the Congress are subject to States' police powers enacted into law (*Engel* v. *O'Malley,* 219 U. S. 128, aff. 182 F. 365), but the law which accordingly subjects them should be an exercise of a real police power. Plaintiff cites no case in line with the situation at bar which supports his contention that subdivision 1 of section 258 is police power legislation. The facts and law deny that contention in this situation because deposits (up to $10,000) in national bank are insured Federally the same as savings banks' deposits are insured (up to $10,000). I must hold that subdivision 1 of section 258 is not that type of law.

Plaintiff concedes that section 371 of the Federal Reserve Act upon which defendant relies, authorizes national banks, without equivocation, to receive " savings deposits ". Plaintiff argues, however, that neither that act of Congress nor any other authorizes a national bank to advertise the fact. The answer to that contention is that such a power may be implied, especially since Congress has provided for national banks " such incidental powers as shall be necessary to carry on the business of banking " (U. S. Code, tit. 12, § 24).

One would be wholly unobserving who did not recognize that there is competition among the banks in the banking world; that the daily press abounds with advertising by banks; that often the rate of interest paid on savings accounts is stressed. A witness in this case testified as to that stressing (209).

It cannot be denied — and it is not — that national banks may advertise for deposits, including savings deposits. The Attorney-General argues that in such national bank advertising, the terms " time accounts " should be used or " thrift accounts " or one or more of the other substitutes to give public notice that national banks may receive " savings deposits ". He would have them use any term except " savings deposits "—the very words found in the act of Congress. Is there any reason why national banks in their publicity should use the term " time deposits " and not " savings deposits "? Those two terms are side by side in section 371 of title 12 of the United States Code.

The Attorney-General further contends that when Congress amended the Federal Reserve Act by specifying " savings deposits " as a kind of deposit which a national bank may receive, that action was without effect and without meaning, because at the time and for long prior, national banks were receiving what actually were savings deposits by virtue of their authority to receive " time deposits " (U. S. Code, tit. 12, § 371). I cannot subscribe to that reasoning. On the contrary, because of the peculiar wording of the empowering provision: National banks may " continue hereafter as heretofore to receive time and savings deposits and to pay interest on the same ", I consider that Congress meant to accomplish two results: first, that national banks in the conduct of their business should have the benefit of people's savings deposits and second, that all doubt about the right of national banks to receive such deposits should be dispelled. There had been some controversy concerning the right of a national bank to advertise and use the word " savings " which had been resolved in favor of the national banks by the administrative branch of the United States Government (1 Federal Reserve Bulletin [1915], p. 18). The choice of language by Congress was intended to legislatively put that dispute at rest. If the intendment of Congress was as I have indicated, a State law restricting the publicizing of the power thus granted would tend, may I repeat, to defeat the obvious objective of the law.

National banks may and do advertise (U. S. Code, tit. 12, §§ 583–586). There are authorities directly in point. Paton's

Digest (1940) holds that the right of a national bank to receive savings accounts necessarily includes the incidental right to advertise as a national bank for such accounts (p. 645). This author also expressed the same view in the 1926 edition of his digest at page 1226 (Vol. 2, §§ 637a, 638a). To the same effect is Fletcher's Cyclopedia Corporations ([Perm. Ed.], Vol. 6, § 2508, p. 305). There are Federal departmental opinions holding similarly (1 Federal Reserve Bulletin [1915], p. 18). No judicial determination on the precise question has been cited in the briefs or in the text books.

I am satisfied that national banks, as they use the words " saving " and " savings " in advertising and publicizing that they may receive " savings deposits " are exercising an implied and incidental power conferred upon them by Acts of Congress (U. S. Code, tit. 12, §§ 24, 371).

The restrictive nature of subdivision 1 of section 258 of the New York Banking Law, defeats the purposes for which Congress created defendant (U. S. Code, tit. 12, § 371). That defeat could be entire were defendant obligated to suspend for lack of enough savings deposits (728-9, 737), with which to operate its business. The New York statute is unconstitutional.

Plaintiff's motions to strike out testimony and for judgment upon which I reserved decision are denied. Defendant's motion to dismiss the complaint at the end of the plaintiff's case upon which I reserved decision is denied. Defendant's motion made at the end of the whole case for judgment dismissing the complaint is granted, with costs.

Judgment with costs in defendant's favor dismissing the complaint will be entered.