Henry W. Lengyel, J.
This is a claim for the appropriation of claimants’ land pursuant to section 30 of the Highway Law, which proceeding is described as Interstate Route 502-3-2. 3, F. I. S. H. (Luzerne Road-Lake George Interchange), Warren County, Map No. 315, Parcel No. 426; and Lake George Correction, F. I. S. H., Warren County, Map No. 3 R-l, Parcel No. 3. Map No. 315 was filed with the Warren County Clerk on February 7, 1962 and Map No. 3 R-l was filed with said County Clerk on February 26, 1962. By stipulation it was agreed that the *780 court would use February 7, 1962 as the initial appropriation date. The claim was filed with the Clerk of the Court of Claims and the Attorney-General on the 27th day of May, 1963, and hap not been assigned or submitted to any other court or tribunal for audit or determination. We adopt the descriptions of the appropriated property as shown on the maps and descriptions filed in the Warren County Clerk’s office.
Claimants were the owners of the property by reason of a deed dated May 15, 1953 and recorded in the Warren County Clerk’s office on the 16th day of May, 1953 in Liber 321 of Deeds at page 438.
We granted claimants’ motion to amend their claim by increasing their ad damnum clause from $39,250 to $45,250.
Before the appropriation the property consisted of 7.18± acres in the Town of Caldwell (now Town of Lake George). The area consisted of generally high and beautifully wooded and landscaped land. The west area of the property sloped downward sharply to the south and west and was largely covered with a natural stand of trees. The entire eastern section of the property was surrounded by many tall pine, maple, birch, oak, and fruit trees. There were no unsightly telephone or electric poles as all 'Services were underground. The lawn Avas entirely watered by an underground sprinkler system with 33 retractable sprayheads. A fast stream, which runs into Lake George, was one border of the property and was partly owned from bank to bank. The landscaping included exotic shrubs and trees. Many large shade trees bordered the lawns. A pine grove at the south end of the property protected the residence from the elements. A raspberry and asparagus garden, dwarf apple trees, quantities of flowering shrubs and bushes and a grape arbor were part of the landscaped area. The subject property was entirely secluded, quiet and peaceful. The residence was so placed on the land to take advantage of the tree screens and to create a gracious and secluded atmosphere. It AAras a colonial-type frame house with an over-all length of 121.5 ± feet. The main section of the house was built about 50 years ago and the north and south wings were added about 25 years later. There Avas a large screened porch attached to the eastern side of the house. This all-year round fully insulated house contained a beautifully panelled living room in rare butternut, approximately 21 feet by 31 feet, with an exposed beam ceiling, an extra large brick fireplace and three French doors opening onto a screened porch. There was a walk-in guest closet and partial indirect illumination. The dining room was 11 feet by 15 feet and had four windows and a French door opening into the porch. *781 At one end was an imported, solid hand-carved Italian marble fireplace and mantel. The kitchen, entirely modern and large, had a bnilt-in range with a copper hood, and exhaust fan, double sink, garbage disposal, an L-shaped breakfast bar and counter cabinet with high chromium bar stools and soft seats. There were ample steel and glass cabinets with self-contained fluorescent lights. Its decoration was most unusual with a tent-like ceiling and outdoor-like wall treatment. Off the kitchen was a laundry room with washer, dryer, and toilet, all ventilated. Another large room, off the kitchen and rear entrance, was a playroom, with an artistically hand decorated ceiling, ski valances and two closets and fireplace. A useful closet was also at this entrance. Beyond the living room was a library with built-in shelves, drawers and panelled ceiling. There was another fireplace in this room. At the south end of the house was the owner’s suite consisting of bedroom with fireplace, two modern bathrooms, extra towel cupboards, extra medicine cabinets, and fine modern fixtures. One bathroom had a glass-enclosed shower, the other a large tub and shower combination. A custom-made and fitted master dressing room which consisted of an entire wall of built-in closets with sliding doors all especially fitted and with additional built-in chests and cupboards. The entire first floor had hardwood flooring. The second floor had a living room with fireplace, four finished bedrooms and three modern bathrooms and showers. Three additional rooms (unfinished) would make two large bedrooms. Numerous additional closets were in the second floor hallway. The cellar was nearly full and divided into two sections each with concrete flooring. A large and adequate oil burner was housed there, supplying steam heat and hot water. This property was in excellent condition. At the rear of the house was a patio and outdoor fireplace. There was a small storage shed of wood frame construction suitable for storage of lawn equipment. Much of the land and building description was taken almost verbatim from the State’s appraisal in evidence as Exhibit B.
The deed to subject property also conveyed a right of way across Route 9N from Hubbell Lane. Said right of way, 10 feet in width, was to be used in common with others as access to a private dock and beach on Lake George. The dock was about 1,600± feet from the northeast corner of subject property.
The deed to subject property also contained a restriction which provided “ that the premises hereby conveyed shall be used solely for private residential purposes and for a single family only ”. This restriction, which ran with the land, prevented a commercial use of this property. The State, almost as an after *782 thought at the trial, threw out the suggestion that the remaining land could be used for residential subdivision. It is our opinion that the location of the residence on the remaining land prevents such use. It is also our opinion that the above restriction precludes such use.
The land itself had a south boundary line 625± feet in length; a west boundary line along the “ Old Mill Brook ” for 868± feet; a north boundary line along Stone Schoolhouse Road for 205± feet; and, an east boundary line along Hubbell Lane for 967± feet.
The highest and best use of the claimants’ property before the appropriation was estate residential. The highest and best use of claimants’ property after the appropriation was residential.
The subject proceeding appropriated approximately 1.583 acres of claimants’ property as follows:
Map No. 3 R-l Parcel No. 3 was a fee without access taking of 1.098± acres. This was an irregular parcel extending from Hubbell Lane to Old Mill Brook and was about 210± feet in width and 120± feet in length on its north boundary and 321.2± feet in length on its south boundary.
Map No. 315 Parcel No. 426 was a fee without access taking of 0.485± acre. This was an irregular parcel westerly of Parcel No. 3 extending along the Old Mill Brook to Stone Schoolhouse Road.
The appropriation separated the remaining lands leaving 0.5-59± acre northwest of Parcel No. 3 and 5.038± acres southeast of said parcel. The 0.559± acre parcel is so steep in topography that the cost to prepare it for use would be equal to the resulting value of the land. We have, therefore, almost completely consequentially damaged this parcel.
As a result of the appropriation, a new highway has been constructed which crosses Old Mill Brook at a point westerly of claimants’ residence and continues across the westerly part of claimants’ premises at a distance of about 200± feet from said residence. In place of the beautiful view of forest and mountain, which claimants could see from their westerly windows and living areas on the west side of their residence, has been substituted the new highway supported by an embankment approximately 27 feet above grade level at its crossing of Old Mill Brook and averaging approximately 20 feet in elevation above the westerly lawns of claimants’ property. All of the sylvan beauty afforded by the forest pre-existing the highway and the privacy and quiet it provided are gone for the State *783 necessarily removed the trees in the course of constructing the new highway. The complete privacy and quiet the claimants enjoyed has been taken from them because the new highway presents a stream of automobile traffic with its attendant noise, lights and odors. It is interesting to note that the State’s appraiser assigned ‘ ‘ non-compensable damages ’ ’ as follows: ‘ ‘ The main house will be further damaged, due to the noise and dirt from the new highway, dead ending of Hubbell Lane, and the loss of direct access to Route No. 9. (Circuitous access available.) ” We agree that the dead ending of Hubbell Lane and loss of direct access are damnum absque injuria. However, we disagree with this approach to noise created by a State highway on appropriated lands. It is our opinion that each case must be judged on its own particular merits always with the realization that this court is charged with the responsibility of determining fair market value as between a willing buyer and a willing seller. As Judge Simon stated in Wulf v. State of New York (Claim No. 42208, p. 4) wherein the State contended that vehicular noise directly attributable to a highway appropriation was not compensable as a matter of law, “Ina proper case, such as an appropriation for highway purposes of residential or institutional property, such as realty on which a school or church is situated, the Court would have no hesitancy in considering the detrimental effect of increased highway noise on the remaining property, since this is a factor which a prudent investor would consider in evaluating the economic worth of the property.” Although not a case involving highway noise we believe the general rule of law governing in appropriation cases and which applies here was well stated in Keinz v. State of New York (2 A D 2d 415, 417, mot. for lv. to app. den. 3 A D 2d 815) : “We must determine the fair market value of the premises before and after appropriation, and if any factor having a bearing on that value is disregarded, then the constitutional requirement of just compensation is not satisfied. We believe that reductions in value due to impairment of view must be considered. No appraiser could possibly isolate that factor in his mind. A 1 willing purchaser ’ would not do so. Two properties might be physically identical, yet their value markedly different because of the surroundings. * * * the 1 view ’ might be a mountainside or a valley as well as a lake. In either event, the view augments the value of the premises, and if a portion thereof is taken and the view is spoiled, the market value of the premises remaining is reduced. The extent of the reduction is no more speculative than many other factors affecting value. It may be a matter of judgment but it is also a matter of dollars and cents, *784 and the constitutional policy requires that such reduction in value not be borne by the owner whose property is taken for a public purpose without his consent. (Town of Fallsburgh v. Silverman, 260 App. Div. 532, affd. 286 N. Y. 594; Lane v. State of New York, 265 App. Div. 890; South Buffalo Ry. Co. v. Kirkover, 176 N. Y. 301.)” (See, also, Anania v. State of New York, 22 A D 2d 756; Buell v. State of New York, 33 Misc 2d 153, 155.)
We have considered the loss of privacy and seclusion, the loss of view, the traffic noise, lights, and odors all as factors causing consequential damage to the remaining property.
Both appraisers stated this residence building was a specialty and that they could not find a comparable sale from which they could fairly determine its fair market value. Therefore, we have accepted their approach of reproduction cost less depreciation. (See Guthmuller v. State of New York, 23 A D 2d 597; Levine v. State of New York, 24 A D 2d 524.) The State’s appraiser did say that if he had known of the sale of the remaining property in 1965 he would have used such sale as a comparable sale and reduced his before and after value. However, he did not do so and, if he had, it would have been, in our opinion, a remarkably strained comparable for the before value of this property.
We accepted in evidence the aforesaid deed in 1965 setting forth the sale of the remaining property by the claimants herein for $37,500. We permitted, over objection, claimants to use this •sale to indicate fair market value after the appropriation. We realize this was a sale made three years and six months after the appropriation; however, it is our opinion that Dormann v. State of New York (4 A D 2d 979) and Pancerev v. State of New York (23 A D 2d 818) were ample authority for our position. As was stated in the Dormann decision (p. 980): “ We find no case precisely in point where testimony was received of a sale two years after an appropriation but sales made prior to an appropriation for an even longer period of time have been approved (Village of Lawrence v. Greenwood, 300 N. Y. 231). The rule in Massachusetts is that testimony of after sales within a reasonable time is admissible and we see no good reason why the same rule should not apply in this State * * * Appellant also argues that the evidence of the after sale was inadmissible because no notice was served by the Attorney-General at least 20 days before the trial that he intended to use such evidence upon the trial as required by section 16 of the Court of Claims Act. This section was quite evidently designed to prevent surprise and give a claimant opportunity to verify or meet such proof. In this case since the claimant made the sale herself she cannot claim surprise in good faith, and the statute should *785 not be construed to require the State to give notice what is already known to the claimant.” In the subject case the claimants’ attorney wrote a letter to the Department of Law which was received on August 13, 1965. This letter was delivered to the Assistant Attorney-General in charge of the trial of the claim herein. In said letter claimants’ attorney advised that the remainder of subject property had been sold on August 2, 1965 for $37,500 to a Mr. and Mrs. John K. Bright. As the State obviously was completely aware of the physical attributes of the remaining property, we do not see how it can cry surprise three months after it was given notice of the date of sale, consideration and grantees. We do not consider the consideration set forth in said sale as establishing the exact after value of said property. However, as we do not believe the character of the Lake George area changed too materially in the period 1962 to 1965 and as the new highway could not have conferred a benefit on the remaining property, we do consider said sale a most important factor in establishing the after value for subject property. We have noted that claimants had retired prior to this sale and after said sale moved to England to care for Mrs. Dennison’s aged parents. Although we find that the 1965 sale was an arm’s length transaction we believe claimants’ circumstances created a.favorable buyers’ market.
The claimants’ appraiser developed a rounded before value for this property of $85,000 which he divided into a land and land improvement value of $26,113 and a building value of $58,336. The State’s appraiser developed a before value of $85,180 which he divided into a land and land improvement value of $32,360 and a building value of $52,820. As we consider that the State’s appraiser more adequately supported his fair market value before the appropriation we have accepted in full his before value of $85,180. We find a fair and reasonable market value after the appropriation of $48,180. The amount claimants have been damaged is $37,000 of which $4,100 is direct damage and $32,900 is consequential damage. We have viewed the property.
The claimants are awarded the sum of $37,000 for all damages direct and consequential, with interest thereon from February 7, 1962 to August 7,1962 and from May 27,1963 to the date of entry of judgment herein.
The award to claimants herein is exclusive of the claims, if any, of persons other than owners of the appropriated property, their tenants, mortgagees and lienors having any right, or interest, in any stream, lake, drainage, and irrigation ditch or channel, street, road, highway, or public or private right of way or the *786 bed thereof within the limits of the appropriated property or contignons thereto; and is exclusive also of claims, if any, for the value of or damage to easements and appurtenant facilities for the construction, operation and maintenance of publicly owned or public service electric, telephone, telegraph, pipe, water, sewer, and railroad lines.