Henry W. Lengyel, J.
The Power Authority of the State of New York (hereinafter referred to as the Authority) as part of the Niagara Power Project constructed a transmission line over a 300± footwide permanent easement running from Niagara to Utica. The Authority constructed two 345-KV transmission lines with the transmission towers on any single circuit a minimum of 500± feet apart and wires a minimum of 32 feet above ground level.
This decision will, of course, set forth this court’s findings and conclusions relative to the effect of the said easement on the Smith property. However, by stipulation entered into at the start of the trial, it was also agreed that the testimony upon the common issues of consequential damages presented both by the claimant Kathleen Gunn Smith and the Authority should be read into and become a part of the records of 11 other claims when said claims are tried. We refer to said stipulation (Exhibit "1”), the oral stipulation of the attorneys of record in Claim No. 39653 and the oral stipulation of the Authority’s trial counsel for the list of claims which are affected by said stipulation. It was also agreed that one attorney would present all of this *987 proof on the part of the claimants and one attorney on the part of the Authority. Because of illness in his family, the original trial counsel for the Authority was forced to withdraw midway in the trial. Another trial counsel completed the case with the consent of claimant’s trial counsel.
This was an exceptionally well tried case, conducted by three very able, well prepared, and vigorous advocates. There have been several trials in claims involving this particular transmission casement. (See, Clark v. State of New York [three claims], 33 Misc 2d 129,134, and 402, mod. 20 A D 2d 182, affd. mem. opn. 15 N Y 2d 990; Olin v. State of New York, 41 Misc 2d 678; La Valle v. State of New York, 47 Misc 2d 1061.) The basic cases on this subject are the three “ test ” cases which were considered in the Clark {supra) decisions. We advert to those particular decisions at this time because we believe there has been a misinterpretation as to the holding of Judge Bastow, writing for the Appellate Division, relative to the question of consequential damages.
In our opinion, Judge Bastow held that, under the terms of the Authority’s permanent easement, as clarified, the claimants’ property was not severed; that there was still access across the easement area; and, therefore, there was not any consequential damage caused to the remaining lands by reason of a severance or a loss of access. Further, it was held that under the state of the record in each of the particular claims, i.e., farm use, potential subdivision development use, and industrial use, there was no substantial proof that the permanent casement and transmission line constructed thereon adversely affected such uses. The appellate court did not hold that there was not, or could not be, consequential damage to all types of remaining property except, of course, as counsel might try to tie such damage into loss of access.
The question of the construction of the transmission line and possibility of danger from the line as constructed or of interference Avith appliances Avas explored at some length on direct and cross-examination. The principal witnesses in this respect were State witnesses, Warren 0. Petersen and ¡Reino Saloma.
Mr. Petersen was in considerable measure responsible for the design and supervision of the construction of the towers and foundations. Ten different towers were designed with the two primary designs being for a span of 1,000 feet and a span of 1,500 feet. The average height of the toAvers Avas 80 feet from ground level to the cross arms and another 12 feet to the top of the toAver. The average cross-arm Avidth was about 68 feet. The towers Aveiglied approximately 10,000 pounds. They *988 were designed with a safety factor of four to one, i.e., it was determined what was required to carry the load and the towers were designed four times as strong as required. The elements primarily taken into consideration in determining the safety factors were the weight of the conductor and static lines, the weight of one-half inch of ice on the lines and the weight of the towers. There were nine different foundations designed for varying soil conditions. The design engineers designed the foundations with a greater strength and safety factor than that incorporated in the tower designs. The average foundation was 28 feet by 28 feet in dimensions. It was this witness’s expert opinion that there was no danger or hazard in this transmission line structurally in place. He pointed out that about 1,700 towers were installed and had been in position since 1960 and 1961. He knew of no structural failure along the entire line since its construction. His firm was and still is the consulting engineering firm responsible for the construction and maintenance of said transmission line.
Mr. Saloma is an electrical engineer and was the project engineer in charge of the design of the current carrying conductors and was also charged in part with the supervision of said construction. He testified that the transmission line was designed with a current carrying potential of 345,000 volts. There were three sets of conductor lines on each tower, each conductor line consisted of two bundles of conductor wires spaced 16 inches apart. There were 35 feet between each conductor line or a total spacing on each tower of 70 feet between the left and right conductor lines. There were two tower lines on this permanent easement. The conductor lines were parallel to one another and there was a distance of 150 feet between the center conductor lines on each tower line. The conductor lines occupy a space of about 220 feet within the 300-foot permanent easement. There were between 35 to 40 feet from the two outside conductor lines and the easement boundary lines. Said conductor lines were a minimum of 32 feet from ground level and had a maximum lateral ifiovement possibility of 30 feet. There were also two shield wires or static lines on each tower which ran above the current carrying conductors. The primary function of the shield wires was to protect the conductor lines from lightning. It was this witness’s opinion that the conductor and shield lines had a life expectancy of 100 years. The design of the line contained safety devices so that, if there was a break in a conductor line, it would be de-energized in l/12th of a second. It was this witness’s expert opinion that there was no element of danger to persons or property either outside the limits or within the limits of the *989 permanent power easement. It was admitted that in weather of high humidity there could be a corona at the connecting point of the conductor line and the insulators. This was caused by lost energy which dissipated in heat and was not considered dangerous.
Both Mr. Petersen and Mr. Saloma agreed that some catastrophic happening could occur which could knock down these towers and lines. However, implicit in their testimony was the conclusion that such a catastrophe would cause many more serious problems of danger and harm than that to be realized from the transmission line. The claimant submitted findings of fact No. 30 which stated: “That the electrical systems, lines, towers and tower foundations are not foolproof ”. This court is of the opinion that nothing is foolproof. However, we do not believe we have to make such a far-reaching determination in this decision. We believe it is necessary that we determine whether this transmission line as designed and constructed will be dangerous to persons or property adjacent to or under said lines. We find that it will not. In fact, in our opinion, after listening to and reviewing the proof, this transmission line is safer than the distribution lines found along the streets of almost every hamlet, village, town and city in this country. We note that at the time of this trial the transmission line, or parts of it, had been in existence and operation for some five to six years. Claimant’s very able counsel did not present to this court any proof of accidents along this line during this period and, it is our opinion, if there had been any, they would have been presented. Certainly the absence of any accidents or harm to persons or property because of this transmisión line reinforces the opinions of these two well-qualified experts. Claimant’s counsel did endeavor to establish danger by reason of the “ Power Black-Out of 1965 ” in the northeastern States. However, this court drew the opposite conclusion. During the greatest electrical catastrophe within memory, there was no record of any accident or harm befalling persons and property under or adjacent to said power easement other than, of course, the harm caused, if any, because of loss of power into the homes and industries of the Northeast.
We find there is no danger from this transmission line to property devoted to agricultural uses, residential uses, potential subdivision uses, commercial uses, recreational uses or industrial uses.
We also find there is no interference to radio, television or other appliances by reason of this transmission line. Further, in a society which is rife with noise, we do not find that the *990 corona noise is a nuisance or a detriment to the market valué óf property adjacent to said easement.
The most difficult problem presented by the power easement claims is the consequential effect of the permanent easement towers and conductor lines on the market value of adjoining residential development property or of adjoining potential residential development property.
The claimant took the position that there was a significant and measurable diminution in market value caused by a limitation of available willing buyers.
The basic proof presented by claimant on this point was a so-called ‘‘ market value study ’ ’ or public opinion survey conducted by a firm of market analysts. The questions in the survey were prepared by a Mr. Klepper in conjunction with claimant’s attorney and claimant’s real estate appraiser.
It is the court’s opinion that a public opinion poll is admissible in evidence when the parties before the court seek to establish the state of mind of the public relative to the marketability of a product. In the subject cases the product was residential property adjacent to a transmission line. Surveys, of course, severely limit the opportunity of cross-examination and they intrinsically possess many of the culpable attributes of hearsay testimony. However, as was stated in Zippo Mfg. Co. v. Rogers Imports (216 F. Supp. 670, 682): “ The Aveight of case authority, the consensus of legal Avriters, and reasoned policy considerations all indicate that the hearsay rule should not bar the admission of properly conducted public surveys.”
As there obviously are risks inherent in survey proof, it must be required to meet standards Avhich will minimize said risks. The cases and articles on this subject indicate that the basic requirements which must be met, before such polls are to be given probative Aveight, are those of necessity and trustAvorthiness.
Polls are necessary when it would not practically be possible to produce in court a sufficient number of witnesses to fairly establish a public state of mind, without totally overburdening the courts. As Avas stated in “Public Opinion Surveys As Evidence: The Pollsters Gro to Court ” (66 Harv. L. Rev. 498, 503): “ The necessity in the poll cases, however, is based on the impracticability of getting all the interviewees into court and of obtaining the same frank answers on the witness stand which Avould be given to an interviewer.”
Trustworthiness is, of course, a desirable attribute for any proof submitted to the courts and Avhen the safeguard of cross-examination is not present as in survey proof, it becomes an *991 absolute necessity. In People v. Franklin Nat. Bank of Franklin Sq. (200 Misc. 557, 566, revd, on other grounds 281 App. Div. 757, mod. 305 N. Y. 453, revd. on other grounds 347 U. S. 373) it was stated that “ The evidence offered should include calling the planners, supervisors and workers (or some of them) as witnesses so that the court may see and hear them; they should be ready to give a complete exposition of the poll and even its results; the work sheets, reports, surveys and all documents used in or prepared during the poll taking and those showing its results should be offered in evidence, although the court may desire to draw its own conclusions.” (See, also, The Uniqueness of Survey Evidence, 45 Cornell L. Q. 322; Public Survey or Poll, 76 ALR 2d 619; Eighth Ave. Coach Corp. v. City of New York, 170 Misc. 243, affd. 259 App. Div. 870, affd. 286 N. Y. 84; and United States v. Aluminum Co. of America, 35 F. Supp. 820.)
The survey presented in subject claim was in three phases: Phase I was a survey of 56 homeowners, 28 of whom lived adjacent to a transmission line and 28 of whom lived in the same developments but away from the transmission line. Phase IT. was a survey of 33 realtors whose names were taken from the professional lists of the Bochester Home Builders Association and the Boaltors Association. Phase III was a survey of 10 mortgage loan officers from 11. banks in the City of Bochester. We refused to accept in evidence the surveys produced under Phases II and III as, in our opinion, they did not meet the basic criteria of necessity or trustworthiness.
Certainly from 10 mortgage loan officers, the claimant could have produced a representative cross section to appear in court and testify both under direct and cross-examination. We do not find any necessity for that survey. The same lack of neceS" sity, in our opinion, applies to the alleged survey of realtors. However, more importantly in Phase II was the requirement of trustworthiness. The claimant’s principal witness on valuation and damage was Mr. Donald A. Lum. Mr. Lum has appeared in one other case against the Authority arising out of this transmission line and is an expert to be heard on these questions in other claims to be tried. Mr. Lum participated very actively in the preparation of the questions to be used in the surveys. Mr. Lum is a member of said Beal Estate Board and at various times has been an officer and director of that group. Without intending to be the least bit derogatory of Mr. Bum’s personal trustworthiness, which we consider to be of the highest quality, we find it inconceivable that the persons interviewed in this category did not know the purpose behind the interview and the *992 result sought to be obtained. Such a survey does not meet our standard of trustworthiness.
We did accept the survey, Phase I, in evidence. However, it was faulty in so many respects that we have not given it any weight in arriving at our conclusions. We believe that critical questions contained in said survey were slanted to obtain a desired result. We do not believe that Mrs. Kurtzenbaum, the lady who was the sole field interviewer in Phase I, was properly equipped to conduct this survey. For example, the firm which conducted the survey felt that selecting homes which were comparable in value was a factor in this survey. Yet Mrs. Kurtzenbaum had no qualifications along that line except that she ‘ ‘ has a feeling of that sort ”. These were but two of the faults developed relative to this survey. Also, and unfortunately, as Mrs. Kurtzenbaum allegedly was not able to attend court to testify during the 10 days of trial, there was no opportunity to examine the only field worker in this survey.
The Authority produced impressive proof that the transmission line did not have a significant adverse effect on market value. We particularly have examined and re-examined the exhibits and testimony offered by Authority witnesses Vredenburg and Strong. We believe that an accurate resume of their conclusions would be that the presence of the transmission line might limit the market, i.e., reduce the number of willing buyers, but that such limitation would not have a measureable or significant effect upon the market value of residential development property or of potential residential property.
Considering all of the evidence, we have arrived at the conclusion that the power line easement in question has only a nominal influence on developed or undeveloped land which possesses the normal residential development characteristics. By “normal characteristics ” we mean subdivisions of a tract development type such as the Crescent Hills Tract, Courtenay Circle and Buttermilk Hill Road. We find that this nominal influence does not have a significant effect upon the market value of houses located next to the easement. We also find that it does not have a significant effect upon vacant land which is considered as potential real estate development land at the date of appropriation.
In our opinion, the testimony of Mr. Layer, one of the claimant’s expert witnesses, buttresses our conclusion. In essence this testimony developed that, from 1961 to 1964, Mr. Layer’s organization purchased three parcels of land along Pinnacle Road and made an offer to purchase an adjacent 400-foot wide parcel of land which was also adjacent to the power easement *993 in question. The price paid for the three parcels purchased in 1961 and 1963 was about $2,000 an acre. The price offered in 1964 for the parcel which was adjacent to the power casement was also about $2,000 an acre.
We also cite with approval the statements contained in the unreported decision of New York State Elec. & Gas Corp. v. Jantzi (Sup. Ct., Erie County, condemnation order March 25, 1960, decision Dec. 14,1960, pp. 6. 7). Said pages were quoted in full in Olin v. State of New York (41 Misc 2d 678, pp. 686 and 687, supra).
However, we consider, in residential property or in potential residential property which has an enhanced value because of the beauty of the view and/or because of seclusion and privacy, that the power easement does cause a consequential damage if it interferes with said view or with said seclusion and privacy. (See Keinz v. State of New York, 2 A D 2d 415; Buell v. State of New York, 33 Misc 2d 153; and Dennison v. State of New York, 48 Misc 2d 778.) Obviously, the court does not consider that the subdivision with normal characteristics, as referred to above, relies upon view, seclusion or privacy as an attribute of market value.
The subject claims were for the appropriation of claimant’s land pursuant to section 30 of the Highway Law, as made applicable by Title 1 of article 5, of the Public Authorities Law, which proceedings are described as Power Authority of the State of New York, Niagara Power Project, Ontario County, Niagara-Adirondack Tie Line, Town of Victor, Map No. OV 453 Parcel No. 453 and Map No. OV 453 T. R. Parcel No. 1214. The description of the permanent easement appropriated was set forth in appropriation Map OV 453 which was filed in the Ontario County Clerk’s office on November 15, 1960. Said appropriation map was clarified by a resolution of the Authority dated October 29, 1962 and recorded in the Ontario County Clerk’s office on December 26,1963. The original appropriation was further clarified by a representation made at the trial by the trial attorney for the Authority and which was received in evidence as Exhibit “ KKKK ”. As was stated in the Clark decision (20 A D 2d 182,190, supra): “ In the event the present [clarification] offer of appellants is accepted by this court and implemented in this litigation by appropriate findings of fact, the Authority and the State would be effectively prevented by the doctrine of equitable estoppel from making any inconsistent claim or taking a conflicting position in any subsequent proceedings to the prejudice of claimants. (21 N. Y. Jur., Estoppel, §§ 54-56.) (See, also, Matter of Martin v. C. A. Productions *994 Co., 8 N Y 2d 226, 231.)”. Although this representation contains some self-serving language, it does more explicitly outline uses that can be made by adjoining owners of the land under the easement. We accept this as a binding representation on the part of the Authority. We have annexed said representation to this decision as Appendix “A” and we suggest this decision be recorded in the Ontario County Clerk’s office. Map No. OV 453 T. R. was a temporary easement which was applied to claimant’s remaining land on September 1, 1964 and which was concluded on September 1, 1965. Claim No. 38863 was filed in the office of the Clerk of the Court of Claims on February 15, 1961 and Claim No. 44751 was filed in said office on January 12, 1965. Neither claim has been assigned. Claimant obtained title to said property by a deed dated December 7,1944 and recorded in the Ontario County Clerk’s office on December 7, 1944.
Prior to the appropriation subject property consisted of 45.35± acres of land as is more fully described in the Authority’s finding of fact numbered “ 8 ” and same is incorporated herein by reference, except that the court finds the south easement line to be 100± feet from the residence and the closest tower to be 150± feet from the residence. The topography of the land from Fisher Road to a point about 75 feet west of the residence building was moderately rolling with some cleared area near said road and directly east of the residence. Otherwise, the land was heavily wooded and the residence quite secluded. The land then sloped sharply from east to west down to a flat and partially marshy area in the vicinity of Irondequoit Creek which ran across the west line of the property in a north-south direction.
The highest and best use of subject property before the appropriation was a modest country estate of 5± acres with supporting recreation lands of 28.35± acres and residential development of the approximately 12 acres of land in the area of Fisher and Probst Roads. It is our opinion that four residences occupying 2.5± to 3± acres could be developed in this area, The highest and best use of said property after the appropriation was the same except that the use of the modest country estate lands with supporting recreational lands had been diminished by the appropriation.
The subject proceeding applied a permanent easement to approximately 11.37± acres of land in a long rectangular parcel 300± feet wide by an average of 1,634± feet long. It ran east and west across said property, leaving approximately 6± acres of land north of the easement and 27.98± acres of land south of the easement.
*995 When we viewed the property we walked on the land from the residence down to said creek. We also walked through every room in the residence. We particularly noted the view of the towers, lines and the easement land from which all trees had been removed. It is our opinion that the easement directly damaged 1.5± acres of the residential site and 9.87± acres of the recreational land by 90%. We further find that there was a definite loss of view from the residence building and the remaining residence site. There was also a diminution in the seclusion afforded the residence site by the woods which were removed by the permanent easement. The Authority made the point that the claimant permitted the Authority to remove some additional trees for which she accepted about $220. Obviously the lady had no choice. When she refused to permit further trees being removed, the Authority filed a temporary easement and removed the additional trees. It is our opinion that the residence building and said 3.5± acres of residence site were damaged 25% by the appropriation.
We have arrived at the following before and after fair market values for subject property.

Before

Residence...........................$16,500.00
Improved Residence Site.............. 7,500.00
12 Acres of potential homesite land____ 12,000.00
28.35 Acres of recreation land......... 992.00

After

$12,375.00
4,162.00
12,000.00
681.00
Total $36,992.00 $29,218.00
It will be noted that we have valued the improved residence site at only $500 an acre more than the potential sites. This reflects, in part, the fact that the residence site did not have an established water supply and that at times water had to be trucked into said property. We believe such situation was subject to correction by the installation of a well.
If the Authority or the State by some affirmative act terminates or interferes with the found rights of this claimant or her successors in title in regard to the lands covered by said easement, or puts said lands or the transmission lines thereon to a greater use than the use stated in its appropriation maps as clarified, then such actions shall constitute a de facto appropriation for which any claimant hereafter might be entitled to compensation. (Jafco Realty Co. v. State of New York, 18 A D) 2d 74, 75, affd. 14 N Y 2d 556; Clark v. State of New York, 33 Misc 2d 129, supra.)
*996 We find that the fair rental value of the temporary easement was $50 and that the loss of trees added a permanent damage of $90, for a total of $140.
The claimant in Claim No. 38863 is awarded the sum of $7,774 for all damages direct and consequential, with interest thereon from November 15, 1960 to the date of entry of judgment herein.
The claimant in Claim No. 44751 is awarded the sum of $140 for the fair rental value of the temporary easement together with direct damages, with interest thereon from September 1, 1964 to the date of entry of judgment herein.
APPENDIX A
The only purpose of the easement is to provide a site for the Authority’s two 345 KV transmission lines.
The OAvner of the underlying fee may use the property in any way which docs not interfere Avith the Authority’s use for such purpose. It is so stated in the language of the easement itself.
Both the Appellate Division and the Court of Appeals in the cases of Clark v. State of New York (supra) have held that under the language of the easement specific rights set forth by those courts are vested in the owners of the fee.
The Authority of course has the right at any time to enter the property covered by the easement for the purpose of maintaining the lines. This can and sometimes Avill involve the driving of vehicles over the right of way. The Authority will do as little damage as practicable to the right of way in exercising this right.
The Authority will be completely reasonable in approving-structures on the right of way but of course such approval must be limited to types of structures which will not interfere with the Authority’s right to maintain the lines and their location must be so limited.
Examples of the type of structures which have been approved are: miniature golf courses, transmission lines and pipe lines. In the case of the miniature golf course, an open space was required within the 300-foot width of the right of way, sufficient to accommodate the Authority’s vehicles.
The oAvners of the fee may, of course, use the right of Avay for farming, Sower gardens, playgrounds and other recreational purposes.