Martin B. Stecher, J.
This is an action brought by two racehorse owners and the Horsemen’s Benevolent Protective Association, Inc. (HBPA) against those State officials charged with supervising thoroughbred horse racing in this State, the New York Racing Association, Inc. (NYRA), the Jockey Club, Inc., and various racing officials employed at NYRA tracks in this State. The suit seeks judgment declaring certain statutes, rules and regulations governing the conduct of racing to be "illegal”, "void” and "unconstitutional”; enjoining officials employed at NYRA tracks from supervising racing in New York, and enjoining "the defendants” from conducting race meetings in this State. Two causes of action are alleged: one asserts the unconstitutionality of certain statutes (L 1926, ch 440, § 3, as amd by L 1934, ch 310, § 1; L 1926, ch 440, § 6-a, as added by L 1934, ch 310, § 3, as amd; L 1926, ch 440, § 9-a, as added by L 1934, ch 310, as amd; L 1926, ch 440, § 9-b, as added by L 1951, ch 324, §4; and all as subsequently amd) and certain rules and regulations of racing (19 NYCRR Part 20 et seq.; presently 9 NYCRR Part 4020 et seq.) promulgated by the New York State Racing Commission pursuant to statutory authority (L 1934, ch 310); the other alleges abuses of authority by the defendants. The complaint which has previously withstood an attack on its sufficiency (35 AD2d 41) seeks no damages. The action was tried without a jury; and after trial I make the following findings:
Prior to 1955, racing both at Saratoga and down-State was conducted by private corporations which owned or leased their tracks and operated racing as private enterprises (cf. Madden v Queens County Jockey Club (296 NY 249) under regulation *469 by the State Racing Commission. Pari-mutuel betting authorized by the State Constitution (art I, § 9) and by statute (L 1940, ch 254, as amd) was and is a principal motivator for horse racing: it provides revenue to the State, prizes to the contestants, funds to build, operate and maintain the tracks, and an opportunity for the public to participate in an otherwise illegal enterprise (see Penal Law, art 225).
As testified to by witnesses Hanes, Basil, Phipps and Vanderbilt, racing was in decline in this State during the early 1950’s, which was a matter of concern to all involved, including officials of the State of New York which has a fiscal interest in the legalized gambling which went on at the tracks. In or about 1955 at the suggestion of the chairman of the commission made to Ogden Phipps, then vice-chairman and now chairman of the board of stewards (directors) of the defendant Jockey Club, Phipps appointed a committee to formulate a new plan for racing.[1] This committee’s proposal known as the "Jockey Club Plan” provided for the incorporation of a nonprofit racing association, the defendant NYRA, and for the acquisition by that association of the physical plants of private corporations at Belmont, Aqueduct and Saratoga racetracks and the conduct of racing by the NYRA at those tracks. In that year, 1955, the Legislature granted statutory authority to implement such a plan (L 1955, ch 812) and defendant NYRA was formed. Twenty members of the Jockey Club became the initial stockholders and trustees of the NYRA and each contributed $50 for his stock. The total capitalization was and remains $1,000 and only Jockey Club members are or have been NYRA trustees.[2] The NYRA thereupon borrowed sufficient sums from banks to acquire and, from time to time, improve the Belmont, Aqueduct and Sara-toga tracks and today, except for the relatively small Finger Lakes Racing Association track, the NYRA tracks provide the only thoroughbred horse racing in New York State. How the *470 NYRA borrowed and repaid these large sums of money is hereafter discussed.
Racing at NYRA tracks is supervised pursuant to statute (L 1926, ch 440, § 9-a, as added by L 1934, ch 310, § 5, as amd) and regulation (19 NYCRR 22.3) by a board of three stewards, one appointed by the commission, one "by The Jockey Club” and one by the "corporation * * * conducting such race meeting”, here the NYRA. These stewards (not to be confused with the board of stewards — directors—of the Jockey Club) have the power to "regulate and control the conduct of all officials and of all owners, trainers, jockeys, grooms and other persons attendant on horses” (19 NYCRR 22.11). They may exclude any person from the grounds of the tracks and suspend duly licensed jockeys, trainers and owners "from acting or riding for [as much as] * * * 60 days” (19 NYCRR 22.12); in addition to barring or suspending such personnel, they may impose a fine (designated a "civil penalty”) not exceeding $250 for each infraction; they have the power to decide "all questions arising in reference to racing at the meeting” which apparently includes determining the order of finishes at a race (19 NYCRR 22.16); they can disqualify any horse or owner from participating in New York thoroughbred racing (except for the Finger Lakes track) unless the owner can prove that neither he nor his horse is "disqualified” in any respect from participating in racing (19 NYCRR 22.17); and in any situation not provided for, the stewards may decide the matter as they "think just”, including the imposition of any of the foregoing penalties (19 NYCRR 22.21). A right to appeal to the commission exists (19 NYCRR 22.14), but, as the commission chairman interprets that right, no question of fact may be reviewed. This may or may not contribute to the relative absence of appeals, there having been but 2 in the last 14 years.
There are other racing officials nominated and hired by the NYRA who control the race from start to finish and who have substantial power over the conduct of the race. The most significant of these is the secretary of the NYRA or the "racing secretary” as he is usually called. Alone or, if he chooses, assisted by a committee, he allocates stalls to the trainers. As the number of applications far exceeds the number of stalls available, the racing secretary may effectively determine who shall and who shall not participate in the race *471 meetings.[3] Not only does the denial of stall space result in a denial of the right to race, but it has other consequences: one who has not entered a horse in a race during a "meeting” may not claim a horse from a claiming race during that meeting. The racing secretary is also the handicapper in handicap races. He determines the weight which each horse shall carry, the function of high weight being — theoretically— to slow the abler horse thereby allowing the lesser horse to compete. In condition races, he writes the conditions of the race — really the conditions of exclusion from the race — and thereby determines which horse may or may not compete in a particular race. Except for the "stakes” races and within the budget projected for each year, the racing secretary allocates the prize money among the various races at the three tracks. Clearly, the power of the racing secretary is extraordinary in that he may determine who shall and who shall not race, under what circumstances, under what handicap and for what prizes.
The stakes races are the most prestigious races run, for the prize money is substantial and an effort is made to attract the best horses in the country to these races.[4] The stakes race program is decided by the NYRA trustees at the beginning of the year; the other races (the "overnights” as most of them are called) are left to the racing secretary.
The plaintiffs contend that thoroughbred horse racing thus conducted is a public function and public enterprise whose conduct has been delivered by the State of New York into the hands of the plaintiffs’ competitors who operate racing for their private benefit thereby denying the plaintiffs equal protection of the laws. The defendants, of course, contend that racing is a private function conducted under substantial and far-reaching public supervision.
Horse racing conducted by the New York Racing Association is not a governmental activity. The NYRA performs none *472 of the functions traditionally performed by government and its structure is that of a corporation, although a rather unusual one[5], having stockholders, directors, title to property and corporate indebtedness. Our inquiry, however, is not limited to the question of whether horse racing in New York is a public function privately conducted or a private function publicly regulated. There is also the question of whether there is such a "symbiotic relationship” (Moose Lodge No. 107 v Irvis, 407 US 163, 175) between the State and the NYRA as to require inquiry into the plaintiffs’ contention that by placing them in a position subject and subordinate to their competitors (cf. Carter v Carter Coal Co., 298 US 238, 311) they are denied equal protection of the laws (Burton v Wilmington Parking Auth., 365 US 715; cf. Jacobson v New York Racing Assn., 33 NY2d 144, 150-151). Examination of the financial structure of the NYRA shows that its ability to purchase and improve its physical plants and conduct its day-to-day business activity was and is completely dependent upon State action, indeed, upon the benevolence of the Legislature.
As previously shown, NYRA’s total capitalization was $1,-000. The act, however, which authorized its incorporation (L 1955, ch 813, § 1) also provided it (at § 3) with sufficient tax deferrals and subordination to assure its lenders that in each year that such funds were required, up to $5,000,000 of parimutuel tax revenues would be available for corporate purposes including "the payment of the cost of amortization of debt * * * including in such cost the interest on such debt * * * which * * * sums so retained shall be exempt from such [pari-mutuel] tax and no lien or charge shall attach thereto in favor of the state for the payment of any tax”. The NYRA made use of these deferrals of tax from the year of its incorporation, 1955, through 1964.
In addition, the State adjusted its pari-mutuel tax income (cf. NY Const, art I, §9, par 1) in accordance with the indebtedness of the NYRA. In 1957, it reduced its tax portion *473 of the wagering pool from 11% to 10% thereby increasing NYRA’s share of the pool from 4% to 5% until 1965 or until NYRA’s "indebtedness to banks * * * in an amount of eight million dollars shall have been discharged” (L 1957, ch 355, § 1). In 1964, when the retained share of the betting pool was about to revert to 11% for the State and 4% for the NYRA, the Legislature extended NYRA’s 5% participation at the State’s expense until 1979 "or such earlier date as the association shall have paid on its long-term indebtedness * * * an aggregate of not more than sixty-five million dollars” (L 1964, ch 942, §2). In 1968, the NYRA’s increased share was again extended, this time until 1980 pending its discharge of an indebtedness not exceeding 68 million dollars (L 1968, ch 91, § 2); and that extension has been continued by further statute to 1985 (L 1970, ch 757, § 3).
In 1968 and thereafter, the Legislature increased NYRA’s share of the wagering pool by an additional "for the purposes of increasing purses * * * awarded to horses in races conducted by such * * * association” (L 1968, ch 91, § 3; L 1970, ch 757, §4); and in 1971, the Legislature further increased the NYRA’s share of such purses on condition that at least 3% of the betting pool be awarded as purses (L 1971, ch 19, § 5).
The symbiosis between the State and the NYRA is thus apparent: the New York Racing Association was created under a law whose purpose, in part, was to enable the State to "derive[s] a reasonable revenue for the support of government” (NY Const, art I, §9, par 1); indeed the NYRA is substantially the only vehicle through which the State procures revenue from thoroughbred horse racing; and the State’s deferral and relinquishment of tax revenues to which the State was and is entitled is the principal source of the NY-RA’s ability to finance both its capital and operating expenses. "The State has so far insinuated itself into a position of interdependence with [the business establishment] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private’ as to fall without the scope of the Fourteenth Amendment” (Burton v Wilmington Parking Auth., 365 US 715, 725, supra; see, also, Cooper v Aaron, 358 US 1, 4).
The consequence of a "State action” relationship, however, *474 is not to require its termination[6]; it is only required that the business enterprise refrain from acting in ways barred to the State, that is, from denying those with whom it deals that fair play and equality of opportunity encompassed in "due process of law”. Despite the urging of the defendants, Jacobson v New York Racing Assn. (33 NY2d 144, supra) does not hold to the contrary and Madden v Queens County Jockey Club (296 NY 249, supra) was decided under very different facts.
We turn to the plaintiffs’ evidence that the NYRA has in fact discriminated in favor of Jockey Club members and against the individual plaintiffs and against the members of the corporate plaintiff.
The plaintiffs have charged that some of the defendants have "fixed” races on behalf of at least one Jockey Club member. The allegation is not that there was tampering with horses or riders so that a particular horse would win. It was the testimony of witnesses that the racing secretary, an NYRA employee, wrote the conditions of at least one race so that only one "quality” horse on the Belmont-Aqueduct grounds would be eligible to enter, making it a certain winner over any other eligibles. While the evidence clearly demonstrates that the racing secretary has the power to exercise such favoritism, the evidence totally failed to sustain the plaintiffs’ position that he abused his position as handicapper or writer of condition races.
As previously indicated, the power to grant stall space is the power to determine whose horses shall or shall not race. The plaintiff sought to prove, by offering evidence of random sampling conducted by a certified public accountant under the direction of a clearly qualified statistician, that during the years 1967, 1968 and 1969, distinct favoritism was shown by the NYRA to Jockey Club members in the allocation of stall space at the Belmont and Aqueduct racetracks. The plaintiffs offered evidence tending to show that during one of those years the favoritism displayed in favor of Jockey Club members in allocating stall space at Saratoga was even more pronounced. Timely and vigorous objection was made to the receipt of this evidence by sampling, on the ground that such evidence is admissible only as a matter of necessity (Muller v Eno, 14 NY 597; Sample v Porrath, 41 AD2d 118; Gerdau Co. *475 v Bowne-Morton Stores, 1 AD2d 581, affd 2 NY2d 905; People v Franklin Nat. Bank, 200 Misc 557; Eighth Ave. Coach Corp. v City of NY, 170 Misc 243, affd 259 App Div 870, affd 286 NY 84), while in this case, the information for the entire population involved was available. Although the evidence, if admissible, would clearly demonstrate that Jockey Club members were more successful in obtaining stall space than were horsemen who were not members and that the power to discriminate existed, the plaintiffs have utterly failed to demonstrate that such difference in allocations resulted from other than reasonable business judgment exercised with the intention of attracting the best available horses to the NYRA tracks.[7]
The statute (L 1926, ch 440, § 9-a, as added by L 1934, ch 310, § 5) provides, as indicated above, that three stewards shall supervise each running race; that one of such stewards shall be "the official steward of the state racing commission” and one each shall be appointed by the Jockey Club and the corporation conducting the race meeting, here the NYRA. The stewards so selected, acting as a body, have substantial powers over the conduct of the actual race, determining the order of finish in a disputed situation, with the power to exclude any person from the grounds and even to suspend licenses, jockeys, trainers, and owners from acting or riding for as much as 60 days. They have the right as well to impose fines and may disqualify horses, owners and other persons from participating at a racetrack. It is the plaintiffs’ contention that these powers are State powers improperly delegated by the statute and by regulation (19 NYCRR 22.3 et seq.).
*476 The Legislature is empowered to grant to a private society or association the power to appoint officials with a limited authority such as the supervision of horse racing (8200 Realty Corp. v Lindsay, 27 NY2d 124; Lanza v Wagner, 11 NY2d 317; Sturgis v Spofford, 45 NY 446); and here it is dubious that racetrack "officials”, such as starters, placing judges, patrol judges, and clerks of the scales, discharge State functions. They would appear to be corporate employees acting upon their employer’s business.
Although the manner in which stewards are chosen appears to be beyond legal challenge, some of the powers granted to them and to the Jockey Club by regulation[8] are questionable.[9]
Section 19 NYCRR 22.12 grants to the race stewards the right to suspend trainers, jockeys and others licensed by the State Racing Commission from "acting or riding” for as much as 60 days. The licensing prerogative is "essentially a sovereign power” (Matter of Fink v Cole, 302 NY 216, 224) and a regulation yielding it to another was held to have been "an unconstitutional relinquishment of legislative powers” (Fink v Cole, supra, p 225). The power to license is a unitary power and as the whole may not be delegated neither may a part. The power to suspend the exercise of rights inherent in a license and the power to reinstate the enjoyment of those rights is a nonseverable part of the licensing authority; and the grant to the race stewards contained in this regulation is an unconstitutional delegation of the licensing authority. Similarly, the power to disqualify an owner who can’t prove to the satisfaction of the stewards that neither he nor his horse is *477 "disqualified” from racing is void as an unconstitutional delegation of the licensing power and also as lacking in adequate guides and standards for reasonable implementation (Fink v Cole, supra, p 225). On the same footing is the automatic disqualification of a person simply because the stewards determined that his or her spouse was "disqualified” (19 NYCRR 25.4).
The race stewards are authorized by section 19 NYCRR 22.13 to impose a "civil penalty” not exceeding $250 "for any improper turf practise.” The grant of the power to impose such a penalty is not inherently unconstitutional (Sturgis v Spofford, 45 NY 446, supra); but the regulation is so lacking in standards as to be unconstitutional.
The regulations make many direct grants of power to the Jockey Club, a private organization unique in American horse racing. As previously indicated, these grants of power come from the promulgation by the commission, as regulations, of the Jockey Club’s own rules. As such, their scope is understandably broad.
The stewards (directors) of the Jockey Club have charge of the registry of stable names, stable colors, all contracts pertaining to the ownership and leasing of horses and all rider contracts (19 NYCRR 22.1). The regulations prohibit any horse from racing unless it is duly registered in the office of the Jockey Club (19 NYCRR 24.1) and no horse owned by any partnership may race unless documentation of ownership has been filed with the Jockey Club and a nominal fee paid (19 NYCRR 26.3). The Jockey Club, according to the regulations, has the right to disapprove any partnership, lease or other arrangement affecting multiple or contingent ownership of a thoroughbred horse where, in its opinion, the arrangement would be to deceive the public as to the persons having an interest in the animal (19 NYCRR 26.7). While it nowhere appears that a stable name is necessary for participation in racing, the regulations require that as a prerequisite to adopting a stable name, the name be registered with the Jockey Club accompanied by the payment of an annual fee to the Jockey Club of $100 (19 NYCRR 26.15). Similarly, a feudal system of apprenticeship of jockeys is written into the regulations of the State Racing Commission, and the supervision of that system, including the approval of apprentice contracts and their supervision, is vested by the commission in the Jockey Club (19 NYCRR Part 32).
*478 The apprenticeship issues are not before the court nor are the questions of how many times a bugle shall be blown or a hell rung. Those provisions of the regulations which require the payment of fees to the Jockey Club or the submission to the Jockey Club’s supervision and discretion as a condition of racing is a matter for judicial inquiry.
Sections 19 NYCRR 26.15 and 26.18 require that a "racing name” be registered by its user with the Jockey Club annually and at an annual fee of $100. The Jockey Club, in its discretion, may refuse such registration. These regulations are beyond the scope of the commission’s power for at least two reasons: the use of trade names, business designations and assumed names is regulated by statute (Business Corporation Law, art 3; General Business Law, art 9-B), and the grant of power to a private organization to nullify the effects of these statutes or to substitute its judgment for that of State agencies and the courts concerning who may or may not use a particular name is beyond the commission’s power. The fee requirement is equally objectionable. Requiring that the payment of $100 annually be made to the Jockey Club makes of such payments "public moneys” (Fox v Mohawk and Hudson Riv. etc. Humane Soc., 165 NY 517) which under the State Constitution "shall not be given or loaned to or in aid of any private corporation or association” (NY Const., art VII, § 8, subd 1). Even "if we assume that the Legislature can create and has created the defendant 'a subordinate governmental agency’ to assist in the enforcement of the * * * laws * * * still that assumption will not establish the proposition that the devotion of these license fees is to a governmental purpose” (Fox v Mohawk and Hudson Riv. Humane Soc., supra, p 525).
Other regulations in the guise of record keeping are in effect licensing regulations. A horse owned by a partnership may not race in New York unless partnership data is filed annually with the Jockey Club, accompanied by an annual fee of $1 (19 NYCRR 26.3). The Jockey Club may, however, refuse to file such data if in its opinion the partnership (or other title or lien status) will mislead the public as to the true sponsorship of the horse (19 NYCRR 26.7). There can be no dispute that disclosure is desirable; but, to direct that the determination of which partnership or other business structure may or may not participate in racing, is a licensing power which the commission may not grant to this private club.
*479 Other regulations either have not been presented for adjudication or they are within the commission’s power to promulgate.
Settle judgment declaring the statutes under consideration to be a proper exercise by the Legislature of its constitutional power; declaring, in accordance with foregoing, which regulations of the commission exceed the commission’s power; and enjoining their use. In all other respects, the requested relief is denied. The judgment shall provide for a stay of execution for 30 days after its entry.

. The Jockey Club is an organization whose membership consists largely of socially prominent people interested in horse racing. It once governed all racing in New York State as it still does in Delaware and some other States but it now limits its activities in this State to maintaining registries of thoroughbred horses, stable names, racing colors and to perform certain other functions hereafter referred to. It is conceded by all parties that it is a "private” and not a public organization.

. Until the commencement of this action, no person was elected a NYRA trustee who was not already a Jockey Club member. This practice has since been varied so that at least one person became a Jockey Club member after being elected a NYRA trustee.

. It is true that horses may race who are stabled at tracks as far away as New Jersey or even Delaware, but the problems of transportation and care of these horses is such that, effectively, horses for whom there are no stable facilities at the track (for this purpose, Belmont and Aqueduct may be regarded as a single track) are excluded from racing.

. The most avid plungers are also sought. The "success” of racing in this State according to the witnesses Hanes, a past chairman of the NYRA board of trustees, and O’Brien, the NYRA vice-president for operations, is measured by the amount of money wagered at the track. Apparently, there are few illusions about "improving the breed” of horses (cf. L 1926, ch 440, § 1, as amd).

. By statute (L 1926, ch 440, § 1-a, as added by L 1955, ch 812, § 1) the certificate of incorporation prohibits use of corporate assets for the payment of any dividend or the repurchase of capital stock; requires, on dissolution, distribution of its assets to a tax "exempt organization” designated by the then Governor; subjects corporate directors to prior approval of the racing commission and to removal on the commission’s application, after hearing, for "action considered not to be in the best interests of racing generally”. The statute, however, grants to such corporation all powers of a "stock” corporation.

. Such termination appears to be under consideration by the Legislature (L 1926, ch 440, as amd by L 1973, ch 346, § 3, adding art VIII, § 201, subd 11 to the PariMutuel Revenue Law).

. Applications for stall space are customarily made by the trainers of horses rather than by the owners. The evidence demonstrated that some trainers train exclusively for Jockey Club members; some train exclusively for non-Jockey Club members and some train for both. Plaintiffs excluded from their statistics the applications of the latter group. The non-Jockey Club trainers submitted 950 applications for stall space during the three years, 1967, 1968 and 1969. The plaintiffs randomly selected 250 of these applications and offered evidence that 73% of them were granted. The plaintiffs also submitted evidence that of all of the Jockey Club applications submitted during these three years, 88% were granted. At Saratoga, the entire population of applicants was considered and, there, 94% of Jockey Club applications were granted while only 58% for non-Jockey Club members’ applications were granted. The plaintiffs demonstrated that the difference in cost between analyzing the entire population of 950 applications and 250 randomly selected applications is approximately $13,500. While, as indicated above, there was no need to reach the issue of admissibility, it is of interest to note the holding in People v Argro (45 AD2d 904) in which evidence of the sample was admitted despite the availability of the entire "population”.

. The origin of the regulations is of interest. For many years, racing in New York State was regulated by the Jockey Club, Inc., an organization incorporated in 1894 (Matter of Fink v Cole, 302 NY 216, 222). It appears, as testified to by the witness, Calvin Rainey, executive secretary of the Jockey Club, that the racing commission thereafter took the Jockey Club’s rules and with minor modification reissued them as regulations made under statutory authority (L 1934, ch 310, as amd). Thus,' the official rules and regulations of the commission deal with such matters of racetrack mystique as the parade preceding the race, when a bell shall be rung or when a bugle shall be blown. The court, of course, is not concerned with the inspiration for the commission rules but only with its authority to promulgate them.

. The defendants deny the plaintiffs’ standing to challenge the regulations, but this issue has been determined adversely to the defendants (35 AD2d 41, supra), and had it not been I would have so held. (See cases there cited as well as National Organization of Women v State Div. of Human Rights, 34 NY2d 416; Matter of Policemen’s Benevolent Assn. v Board of Trustees, 21 AD2d 693; Empire State Chapter of Associated Bldrs. and Contrs. v Rome Housing Auth., 72 Misc 2d 910; Empire Elec. Contrs. Assn. v Fabber, 71 Misc 2d 167.)