Filed 10/12/23  Vaccarezza v. Baker CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

|  |  |
|---|---|
| PRISCILLA VACCAREZZA et al.,<br><br>Plaintiffs, Appellants and Cross-Respondents.<br><br>v.<br><br>VINCENT A. BAKER et al.,<br><br>Defendants and Respondents. | B322200<br><br>(Los Angeles County Super. Ct. No. BC597908) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard J. Burdge Jr., Judge.  Reversed with directions.

Law Offices of James R. Morgan and James R. Morgan for Plaintiffs and Appellants.

Wallace, Brown & Schwartz and George M. Wallace; Law Offices of Lisa J. Brown and Lisa J. Brown for Defendants, Respondents, and Cross-Appellants.

# INTRODUCTION

Priscilla and Carlo Vaccarezza are racehorse trainers. In 2014 the Vaccarezzas ran their three-year-old filly, Little Alexis, in a race at Santa Anita Park in Arcadia. After the race, Little Alexis had a fever that prevented the Vaccarezzas from flying her to Kentucky for a scheduled auction, where they hoped to sell her for $1.5 million. Little Alexis's performance declined after the race, and the Vaccarezzas ultimately sold her a year later for $440,000.

The Vaccarezzas sued Dr. Vincent Baker, who had performed medical treatment on Little Alexis before the race, and his medical group for veterinary malpractice. The Vaccarezzas claimed that Baker failed to disclose abnormal results from a hematology test he conducted shortly before the race and that, had Baker disclosed the results to the Vaccarezzas, they would have scratched Little Alexis from the race. And then, according to the Vaccarezzas, they could have transported Little Alexis to Kentucky for the auction. The jury accepted the Vaccarezzas' theory and awarded them $1,060,000—the difference between $1.5 million, what the Vaccarezzas alleged Little Alexis was worth before the race, and $440,000, what they sold her for a year later.

Baker filed a motion for judgment notwithstanding the verdict, arguing the Vaccarezzas failed to show the applicable standard of care required him to disclose the hematology results. Baker also filed a motion for a new trial, arguing in the alternative that, even if he did commit malpractice, the jury's damages award was excessive. The trial court denied the motion for a new trial on the ground of excessive damages, but granted the motion for judgment notwithstanding the verdict, ruling the

Vaccarezzas failed to establish the requisite standard of care. The court entered judgment for Baker, and the Vaccarezzas appealed.

The Vaccarezzas contend the trial court erred in granting the motion for judgment notwithstanding the verdict because substantial evidence supported the jury's finding the standard of care required Baker to disclose the abnormal hematology test results. We agree with the Vaccarezzas on this point. The testimony from the Vaccarezzas' expert was sufficient to establish the appropriate standard of care, and Baker did not present any contrary evidence.

Baker contends in his cross-appeal the trial court erred in denying his motion for a new trial on the ground of excessive damages. We agree with Baker on this point. The proper measure of damages was the depreciation in Little Alexis's value caused by Baker's negligent care. The Vaccarezzas' evidence showed, at most, Baker's malpractice caused a fever that temporarily prevented Little Alexis from flying to Kentucky for the scheduled auction, but the Vaccarezzas did not present substantial evidence the malpractice caused any long-term injuries that depreciated Little Alexis's value by over $1 million. Therefore, we reverse the judgment and direct the trial court to enter a new order denying Baker's motion for judgment notwithstanding the verdict and granting Baker's motion for a new trial.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.   *The Vaccarezzas Enter Little Alexis in a Breeders'*
     *Cup Race at Santa Anita Park*

The Vaccarezzas purchased Little Alexis in 2012.  Between February 2014 and September 2014, when Little Alexis was three years old, she ran four races.  She won her first two.  Her third race was the Test Stakes, a Grade 1 stakes race with a $500,000 purse.[1]  She finished third, losing to the winner by only one length.  Her fourth race was the Cotillon Stakes, another Grade 1 stakes race, with a purse of $1,000,000.  Little Alexis finished fourth.

After these races, the Vaccarezzas consulted with a bloodstock agent[2] about selling Little Alexis.  They decided to

---

[1]   The Vaccarezzas' adult son explained during trial that a stakes race is a race for horses that have demonstrated their ability to compete at a high level.  Grade 1 is the highest level of stakes race and offers the highest prizes.  (See *Dimario v. Coppola* (E.D.N.Y. 1998) 10 F.Supp.2d 213, 218 ["'Stakes races are the highest class of race in any jurisdiction, and usually involve the largest purses.'"]; *Halpern v. Lomenzo* (N.Y. Sup. Ct. 1975) 81 Misc.2d 467, 471 ["The stakes races are the most prestigious races run, for the prize money is substantial and an effort is made to attract the best horses in the country to these races."].)

[2]   The Vaccarezzas' evaluation expert, Thomas Clark (himself a bloodstock agent), explained that a bloodstock agent advises clients on the purchase and sale of horses.  "Generally speaking, a bloodstock agent arranges transactions between buyers and sellers of horses.  Bloodstock agents are valuable for their knowledge of the industry and its trends and generally work on a

enter Little Alexis in the Breeders' Cup Filly and Mare Sprint at Santa Anita Park, another Grade 1 stakes race, scheduled for November 1, 2014. The Vaccarezzas planned to transport Little Alexis by plane to Kentucky on November 2, 2014 for an auction scheduled to take place on November 3, 2014.

B. *Baker Provides Veterinary Care for Little Alexis Prior to the Race*

Little Alexis traveled from Florida to Santa Anita Park approximately three weeks before the Breeders' Cup race. Baker provided veterinary care for Little Alexis after she arrived. On October 30, two days before the race, Baker administered a shot of ketoprofen—an anti-inflammatory drug—and an "electrolyte jug with vitamins via catheter." The next morning, Little Alexis had a lump on her neck (near the injection sites) and a 103.2-degree temperature.[3] When Little Alexis's groom and Carlo Vaccarezza touched the lump, Little Alexis reacted as if she was in pain.

Baker gave Little Alexis a shot of phenylbutazone (Bute),[4] another anti-inflammatory drug, to reduce the fever. Baker also drew some blood from Little Alexis and ordered a complete blood

---

commission basis." (*Tolin v. C.I.R.* (2014) 107 T.C.M. 1339, 10, fn. 12.)

[3] The Vaccarezzas' medical expert testified the normal temperature range for a horse is between 99 and 101 degrees.

[4] "Phenylbutazone is an anti-inflammatory medication administered to horses. Federal law restricts this drug to use by or on the order of a licensed veterinarian." (*Baker v. Illinois Racing Bd.* (Ill. App. Ct. 1981) 101 Ill.App.3d 580, 582.)

count and Serum Amyloid A (SAA) test. Baker received the results later that day: Little Alexis had a "slightly elevated" white blood cell count, but an SAA level of 2,534 (much higher than the normal upper limit of 15), which indicated an "inflammatory reaction" from trauma or an infection.

The following morning (the morning of the race), Little Alexis's temperature had dropped to 100 degrees, and the size of the lump on her neck had decreased. Baker told Carlo that Little Alexis was "okay" to race. Baker did not disclose the hematology results to the Vaccarezzas.

C. *After the Race, Little Alexis Has a Fever That Prevents the Vaccarezzas from Flying Her to Kentucky*

Little Alexis finished second to last in the race. After the race, her temperature was 104.7 degrees, and the size of the lump on her neck had increased.

For Little Alexis to fly on a plane from California to Kentucky, a veterinarian had to complete a health certificate attesting that Little Alexis met various health conditions, including that her temperature was below 102 degrees. Because of her fever, the Vaccarezzas could not obtain the necessary health certificate that would allow them to fly Little Alexis to Kentucky for the scheduled auction. Little Alexis stayed in California for three days after the race, at which point her temperature had stabilized, and the Vaccarezzas transported her by air back to Florida. The Vaccarezzas sold Little Alex for $440,000 a year later at the same annual auction in Kentucky.

D. *The Vaccarezzas Sue Baker*

The Vaccarezzas sued Baker for veterinary malpractice, alleging Baker's negligent veterinary care caused permanent

injury to Little Alexis. In particular, the Vaccarezzas alleged Baker "failed to administer the pre-race medication [i.e., the ketoprofen and electrolyte jug] in compliance with the applicable standard of care causing new injury to [Little Alexis's] jugular vein . . . including, but not limited to phlebitis, thrombosis, cellulitis, and . . . an elevated temperature rendering her too sick to receive a veterinarian approval to timely fly back to Kentucky for her scheduled auction . . . ." The Vaccarezzas further alleged Little Alexis's injury was "ongoing and precluded [her] from ever performing at [the] level . . . she displayed" prior to the negligent care.

### E. *The Parties Present Evidence at Trial*

#### 1. *The Vaccarezzas' Evidence of Baker's Malpractice and Little Alexis's Injuries*

The Vaccarezzas' theory of liability changed down the homestretch. At trial the Vaccarezzas did not attempt to prove Baker negligently administered the ketoprofen and electrolyte jug. Instead, the Vaccarezzas sought to prove that Baker negligently failed to disclose the hematology results and that, after receiving the results, he failed to advise them to scratch Little Alexis from the race.

Dr. Michael Chovanes, an equine veterinarian who works at racetracks, testified as an expert witness for the Vaccarezzas. His opinion was that the medications Baker administered before the race caused Little Alexis to develop "cellulitis, thrombosis, and phlebitis." Chovanes specifically testified, however, both ketoprofen and an electrolyte jug were typical treatments administered to horses 48 hours before races. He did not have

7

any opinion whether Baker administered the medications negligently.

When discussing Little Alexis's hematology results, Chovanes testified SAA levels measure inflammation in the body. He testified that Little Alexis's SAA level of 2,543 was "extremely high," the highest level he had ever seen in a horse, which indicated "a huge systemic reaction" and "huge complication." When asked by counsel for the Vaccarezzas whether "it would be the standard of care to tell the owner or trainer about these results as soon as you receive them," Chovanes said, "Yes." When asked whether the standard of care required advising a trainer to scratch a horse with SAA levels that high, Chovanes said it was, "unequivocally."

Chovanes testified the stress of the race caused Little Alexis's temperature to increase to 104.7 degrees after the race. He explained racing would cause inflammation "to go up," the Bute "to wear off," and the temperature therefore to "be up." In his opinion, Little Alexis's temperature likely would not have spiked had the Vaccarezzas scratched her from the race.

Chovanes also reviewed pictures of Little Alexis taken after the race that showed swelling outside her jugular vein, which, according to Chovanes, indicated a vein blockage. In Chovanes's opinion, the stress of the race caused the cellulitis, phlebitis, and thrombosis to come "back in a big way" because prior to the race the neck "didn't look too bad," although he admitted nobody had done an ultrasound on the vein. When asked by counsel for the Vaccarezzas whether he believed Little Alexis's "neck bulge would have come back and grown but for the race," Chovanes answered: "I don't know."

Carlo testified he would have scratched Little Alexis from the race had Baker discussed the hematology results with him.

8

The Vaccarezzas did not run Little Alexis in another race for five months after the Breeders' Cup race, and Carlo testified she never ran at the same level or "regained the form" she had before that race. Carlo testified that, "every time we thought that [her] vein went back to normal, . . . as soon as we just put a little bit of speed, a little bit of stress on her, the thing used to blow up."

2. *The Vaccarezza's Evidence of Little Alexis's Depreciation in Value*

Thomas Clark, a bloodstock agent and professional thoroughbred appraiser, testified as an expert witness for the Vaccarezzas on Little Alexis's value. In Clark's opinion, Little Alexis's value on October 30, 2014—two days before the Breeders' Cup race—was $1.5 million.

To arrive at his valuation, Clark reviewed the sales of comparable fillies sold between 2014 and 2016. Clark explained comparable fillies included those similar in "type, accomplishment, . . . and pedigree."[5] Clark explained Little Alexis was fairly easy to appraise because "she was running against the best fillies in the country" and performing comparably. Sweet Reason, the filly that defeated Little Alexis by one length in the Test Stakes, sold for $2.7 million; Clark explained that Sweet Reason and Little Alexis had similar racing ability, but that Sweet Reason's value was at a "premium"

---

[5] Clark explained a horse's pedigree depended on the performance record of its sire,* dam,** and other relatives (particularly on the female side).

    \* A "sire" is a male parent of a horse. (*Den Besten v. C.I.R.* (2019) 118 T.C.M. 418, 5, fn. 5.)

    \*\* "A 'dam' is 'a female parent of a horse.'" (*Maupin v. Sidiropolis* (2004) 215 W.Va. 492, 494, fn. 2.)

because she won multiple Grade 1 Stakes and had a strong pedigree. My Miss Sophia (whom Little Alexis defeated by four lengths in her first race) sold for $2.15 million at the Kentucky auction where the Vaccarezzas intended to sell Little Alexis. Clark considered My Miss Sophia a close comparison because she and Little Alexis had similar performance records and pedigrees, although My Miss Sophia's pedigree was "slightly stronger." Clark also identified a fourth filly that sold for $1 million at the same auction, which Clark considered "definitely of a lower value" than Little Alexis because it had a weaker performance record.

Carlo testified during the trial he agreed with Clark's valuation. He stated he and Priscilla were seeking as their damages the difference between $1,500,000 and $440,000 (the amount they sold Little Alexis for).

### 3. *Baker's Evidence*

Baker testified as an expert witness in his case. He stated that, in his professional judgment, Little Alexis's elevated SAA levels did not prevent her from running the race. Baker explained that he might advise a trainer to scratch a horse with elevated SAA levels if he did not know why the horse had the elevated SAA levels, but that he knew Little Alexis's SAA levels were caused by the lump on her neck. Because Little Alexis's temperature had stabilized and she was "doing very well" by the morning of the race, Baker believed running in the race would not harm her. Baker, however, did not dispute Chovanes's testimony that the applicable standard of care required a veterinarian to disclose abnormal SAA levels to the horse's trainer. Indeed, similar testimony came straight from Baker's mouth: He confirmed it was his practice to discuss abnormal

10

results with his clients. Baker testified that he tried to call Carlo and "went by the barn" on October 31, 2014 (the day he received the results), but that he was unable to reach Carlo. Baker did not explain why he did not discuss the results with Carlo when he saw him the next morning before the race.

Gayle Van Leer, a bloodstock agent, rendered an opinion on Little Alexis's value "up to the point where she ran in the Breeders' Cup." Van Leer testified that she disagreed with Clark's valuation of $1.5 million and that, in her opinion, Little Alexis's value at that time was between $375,000 and $475,000. Van Leer explained that, while Little Alexis performed very well in her first Grade 1 stakes race (the Test Stakes race), she did not perform as well in the second Grade 1 stakes race (the Cotillon Stakes). According to Van Leer, there was a question whether Little Alexis would continue to perform well against high level competition. Van Leer also stated that medical records from when Little Alexis was two years old indicated multiple treatments to her tendons, which could affect her future racing prospects.

E.    *The Jury Returns a Verdict in Favor of the Vaccarezzas, and Baker Files a Motion for Judgment Notwithstanding the Verdict or in the Alternative for a New Trial*

The jury returned a verdict in favor of the Vaccarezzas and awarded them $1,060,000 in damages. Baker filed a motion for judgment notwithstanding the verdict, arguing, as relevant here, "[t]here was no substantial evidence to support the existence of [the Vaccarezzas'] claimed standard of care . . . ." In particular, Baker argued that Chovanes testified his personal practices were to immediately disclose the results of a hematology test to clients

11

and to advise a client to scratch a horse with high SAA levels, but that Chovanes did not testify other veterinarians generally do the same.

Baker also filed, in the alternative, a motion for a new trial. As relevant here, Baker argued (more or less) the damage award was excessive because Vaccarezza did not present substantial evidence Baker's failure to discuss the blood results with the Vaccarezzas or advise them to scratch Little Alexis caused the horse's value to decrease by over $1 million dollars. Baker asserted the jury could not "have reached the amount of damages it did without engaging in impermissible speculation . . . ."

F. *The Trial Court Denies the Motion for a New Trial, but Grants the Motion for Judgment Notwithstanding the Verdict*

The trial court denied the motion for a new trial, ruling substantial evidence supported the damages award. The court ruled that Clark "testified convincingly" Little Alexis was worth $1.5 million before the Breeders' Cup race and that it was within the province of the jury to weigh the credibility of the experts' testimony regarding the value of Little Alexis.

The trial court, however, granted the motion for judgment notwithstanding the verdict. The court ruled the Vaccarezzas "did not establish a relevant, recognized standard of care in California" or show a "veterinarian of ordinary skill would have treated the facts of this case differently" than Baker. The court largely agreed with Baker that Chovanes primarily discussed his personal practice of informing clients about abnormal hematology results, but that Chovanes did not discuss "how veterinarians in California reported the [SAA] tests in 2014." The court entered

12

judgment for Baker, the Vaccarezzas timely appealed, and Baker cross-appealed.

## DISCUSSION

A. *The Trial Court Erred in Granting Baker's Motion for Judgment Notwithstanding the Verdict*

"'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. . . .  As in the trial court, the standard of review [on appeal] is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion.'" (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 192; see *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770; *Guzman v. NBA Automotive, Inc.* (2021) 68 Cal.App.5th 1109, 1115.)  "We, like the trial court, may not reweigh the evidence or judge the credibility of witnesses.  ""If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied . . . .""" (*Kruthanooch v. Glendale Adventist Medical Center* (2022) 83 Cal.App.5th 1109, 1122; see *Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 313.)  When reviewing an order granting a motion notwithstanding the verdict, we "resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury's verdict." (*Kruthanooch*, at p. 1122, internal quotation marks omitted; see *Johnson & Johnson Talcum Powder Cases*, at pp. 313-314.)

"To establish a veterinarian malpractice claim, a plaintiff is required to present expert testimony establishing the appropriate standard of care in the relevant community." (*Quigley v.*

13

*McClellan* (2013) 214 Cal.App.4th 1276, 1283; see *Williamson v. Prida* (1999) 75 Cal.App.4th 1417, 1425.) The standard of care requires only that veterinarians "exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances." (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1081; see *Quigley*, at p. 1283; *Williamson*, at p. 1424.)

The trial court ruled Chovanes's testimony was not substantial evidence the standard of care required a veterinarian to disclose the results of abnormal hematology results, primarily because, the trial court stated, Chovanes testified about his personal practice but not the practice of other veterinarians in California. That was not a fair reading of Chovanes's testimony. Viewing the evidence in the light most favorable to the verdict, the jury could reasonably find based on Chovanes's testimony that the standard of care required Baker to disclose Little Alexis's abnormal hematology results to the Vaccarezzas. (See *Kruthanooch v. Glendale Adventist Medical Center*, *supra*, 83 Cal.App.5th at p. 1122 [substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion," internal quotation marks omitted].)

Counsel for the Vaccarezzas asked Chovanes: "Are you familiar with the standard of care for racetrack veterinarians?" Chovanes said that, based on his 40 years of experience providing veterinary care at racetracks, he was. After Chovanes testified he had reviewed the California Veterinary Medicine Practice Act, counsel for the Vaccarezzas asked Chovanes whether there were "any differences between the California Practice Act and the same standard of care that you utilize in your practice." Chovanes stated: "No. In all the states that I've worked and am

14

licensed in, it's all similar." Counsel for the Vaccarezzas asked whether California has "a separate standard of care with respect to performing a CBC [complete blood count] or an SAA," to which Chovanes again responded, "No."

After Chovanes discussed Little Alexis's high SAA levels, counsel for the Vaccarezzas asked Chovanes, "What did you understand to be the standard of care for a veterinarian once he receives information that this horse has an extremely high [SAA] level? Would it be the standard of care to tell the owner or trainer about these results as soon as you receive them?" Chovanes said, "Yes." He explained that a veterinarian should disclose the SAA levels because they showed a huge systemic reaction and huge complications and that the SAA test was the "best we have" for determining in real time the level of inflammation in the body. Counsel for the Vaccarezzas also asked Chovanes, "Is it the standard of care to inform the client on the day of the race if there were abnormal blood results?" Chovanes answered, "Yes. That's why we have the [SAA] test."

The trial court focused on the fact Chovanes did not testify about "how veterinarians in California reported the tests in 2014." Putting aside that Chovanes did testify he was familiar with the standard of care in California and that his practice conformed with that standard, Chovanes did not have to discuss the practice of veterinarians in California specifically. "The test for determining [an expert witness's] familiarity with the standard of care is knowledge of similar conditions." (*Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 470-471.) "'[G]eographical location may be a factor considered in making that determination'"—particularly in "areas of medicine in which geographic location is especially relevant"—but "[g]eographical generalizations or localizations do

15

not provide a practical basis for measuring 'similar circumstances.'" (*Avivi*, at pp. 468, 470; see *Sinz v. Owens* (1949) 33 Cal.2d 749, 756; *Borrayo v. Avery* (2016) 2 Cal.App.5th 304, 311.) Chovanes testified he was familiar with the standard of care for racehorse veterinarians providing care at the track based on his 40 years of experience in the industry, and he explained why the standard of care required a veterinarian to disclose abnormal SAA results before a race. That was sufficient. (See *Borrayo,* at p. 312 [medical professional may establish familiarity with standard of care through his training and experience].)

Baker relies heavily on *Quigley v. McLellan*, *supra*, 214 Cal.App.4th 1276. In that case the plaintiff, the purchaser of a show jumping horse, hired the defendant veterinarian to examine the horse before the plaintiff purchased it. (*Id.* at pp. 1280-1281.) The plaintiff bought the horse, which later developed injuries that prevented it from competing. The plaintiff sued the veterinarian, claiming the veterinarian's examination was negligent. (*Id.* at pp. 1281-1282.) At trial, the plaintiff's expert testified the standard of care during a prepurchase examination required the veterinarian to "identify[ ] the problems" with the horse, "document[ ] them," and "explain[ ] the relevance." (*Id.* at p. 1284.) The expert testified the veterinarian fell below the standard of care because the veterinarian advised the plaintiff the horse was suitable for its intended use, even though the horse had abnormalities in its neck and spine, and because the veterinarian's prepurchase examination report failed to include the abnormalities in the horse's medical history. (*Id.* at pp. 1284-1285.) The court in *Quigley* reversed the judgment in favor of the plaintiff, ruling she had failed to establish a recognized standard of care because her expert witness "simply disagreed with the conclusions that [the

veterinarian] drew from the prepurchase examination" and thought "the best approach" would be to disclose more information to the owner. (*Id.* at p. 1285.) The expert witness did not, according to the court in *Quigley*, explain "how an average veterinarian of ordinary skill would have treated the facts of this case differently." (*Id.* at p. 1286.)

Though *Quigley* gives the Vaccarezzas a run for their money (and the trial court relied on the case), it ultimately is distinguishable. First, the expert witness in *Quigley* testified only generally about what the standard of care required during a prepurchase examination—that is, identifying the problems, documenting them, and explaining their relevance. In contrast, Clark specifically testified the standard of care required a veterinarian to disclose abnormal hematology results the day before a race and, even more specifically, to disclose extremely high SAA levels. While Clark may not have stated in exact words that an "average veterinarian of ordinary skill" would have done so, it was fairly and directly implied from his testimony. (See *Keen v. Prisinzano* (1972) 23 Cal.App.3d 275, 280 ["[e]ven where expert testimony [on the standard of care] is required, . . . the jury is entitled to draw reasonable inferences" from the expert's testimony "in finding the standard of care"].)

Second, Baker did not present any evidence challenging Clark's description of the standard of care—at least with respect to whether the standard of care required disclosure of the hematology results. Baker never claimed that, in his professional judgment, disclosure of the hematology results was not medically necessary. To the contrary, Baker admitted his normal practice was to discuss all abnormal results with clients. (See *Yazdi v. Dental Bd. of California* (2020) 57 Cal.App.5th 25, 40 [substantial evidence supported the finding the standard of care required a

17

dentist to obtain informed written consent from patients prior to treatment where the petitioner's expert testified that was the standard of care and the dentist's expert admitted that was his regular practice].)

Baker also cites *Williamson v. Prida*, *supra*, 75 Cal.App.4th 1417. In *Williamson* the owners of a racehorse sued a veterinarian for malpractice, claiming the veterinarian negligently administered a shot to the horse. (*Id.* at p. 1420.) The court in *Williamson* reversed the judgment in favor of the owners, holding the owners failed to show the veterinarian breached the applicable standard of care. (*Ibid.*) *Williamson* too is distinguishable. In that case the owners' expert witness did not testify the standard of care required the veterinarian to treat the horse differently. The expert witness testified only that he "didn't agree with" the veterinarian, that he "couldn't see the reason" the veterinarian administered a particular drug, and that the injection was not "proper." (*Id.*, at pp. 1425-1426; see *Rasmussen v. Shickle* (1935) 4 Cal.App.2d 426, 429 ["'Proper treatment implies that no error shall be committed . . . , that an approximate perfect result will be produced, that such result is guaranteed, whereas the law only demands that the physician use reasonable care to attain such approximate perfection'"].) Here, Clark didn't testify that he simply disagreed with Baker's approach; he specifically stated that Baker's failure to disclose the hematology results fell below the standard of care in the industry.

The trial court erred in granting Baker's motion for judgment notwithstanding the verdict. Therefore, the judgment must be reversed.

18

B.    *The Trial Court Erred in Denying Baker's Motion for a New Trial*

Baker argues in his cross-appeal that, even if the trial court erred in granting his motion for judgment notwithstanding the verdict, we should not reinstate the verdict because the court erred in denying his motion in the alternative for a new trial.  He is right this time.

1.    *Applicable Law and Standard of Review*

Code of Civil Procedure section 657 authorizes the trial court to vacate a verdict and grant a new trial on certain grounds "materially affecting the substantial rights" of a party, including "[e]xcessive or inadequate damages."  (Code Civ. Proc., § 657, subd. (5).)  Code of Civil Procedure section 657 further provides: "A new trial shall not be granted upon the ground of . . . excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."

"The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial."  (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506; see *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1067; *Phipps v. Copeland Corp. LLC* (2021) 64 Cal.App.5th 319, 338; *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 299.)  Where a trial court denies a motion for a new trial based on excessive damages, "'[w]e review the jury's damages award for substantial evidence, giving due deference to the jury's verdict and the trial court's denial of the new trial motion.'"  (*Burchell v. Faculty Physicians & Surgeons etc.* (2020) 54 Cal.App.5th 515, 527; see *Bigler-Engler,* at p. 300.)

19

"In considering the contention that the damages are excessive," we "must determine every conflict in the evidence" in favor of the prevailing party and give that party "the benefit of every inference reasonably to be drawn from the record." (*Seffert*, at p. 508; see *Burchell*, at p. 527; *Bigler-Engler*, at p. 300.)

> 2. *Substantial Evidence Did Not Support the Jury's Damages Award*

Baker argues that the jury's award of damages was excessive and that he is entitled to a new trial because the Vaccarezzas failed to prove "some negligence on the part of [Baker] caused a physical injury to [Little Alexis] . . . sufficiently serious and permanent" to reduce Little Alexis's value by over $1 million.[6] Baker is legally and factually correct.

To prevail on a cause of action for veterinary malpractice, the plaintiff must prove "some injury to the owner [of the animal] proximately caused by [the veterinarian's] departure" from "the relevant recognized standard of care exercised by other veterinarians." (*Williamson v. Prida, supra*, 75 Cal.App.4th at p. 1425.) "Actions for veterinary malpractice . . . seek damages for property damage because animals are a form of personal property under California law"; a "claim for professional negligence against a veterinarian is thus a claim for property

---

[6] Baker also moved for judgment notwithstanding the verdict on the ground the Vaccarezzas did not provide "substantial evidence concerning medical causation of compensable damage." The trial court did not grant the motion for judgment notwithstanding the verdict on this ground, and Baker does not argue the trial court should have granted the motion on this ground. Baker seeks a new trial on remand, not judgment.

20

damage." (*Scharer v. San Luis Rey Equine Hospital, Inc.* (2012) 204 Cal.App.4th 421, 428.) Generally, a plaintiff may recover as damages for tortious injury to personal property "'the depreciation in value (the measure being the difference between the value immediately before and after the injury), and compensation for the loss of use.'" (*Hand Electronics, Inc. v. Snowline Joint Unified School Dist.* (1994) 21 Cal.App.4th 862, 870; see *Pacific Gas & Electric Co. v. Mounteer* (1977) 66 Cal.App.3d 809, 812 ["the measure of damages for tortious injury to personal property is the difference between the market value of the property immediately before and immediately after the injury, or the reasonable cost of repair if that cost be less"]; *Smith v. Hill* (1965) 237 Cal.App.2d 374, 388 [same].)[7] Therefore, the proper measure of the Vaccarezzas' damages was the depreciation in Little Alexis's value immediately after the injuries proximately caused by Baker's negligent care.[8] (See *Fulle v. Kanani* (2017) 7 Cal.App.5th 1305, 1312 ["[t]he measure of damages in California for tortious injury to property is 'the

---

[7] With one exception: The "usual standard of recovery for damaged personal property—market value—is inadequate when applied to injured pets," which generally have no market value. (*Martinez v. Robledo* (2012) 210 Cal.App.4th 384, 392.) Therefore, an injured pet's owner may "recover the reasonable and necessary costs incurred in the treatment and care of the animal attributable to the injury," even if the costs exceed the animal's market value. (*Ibid.*) The Vaccarezzas did not seek the costs of Little Alexis's medical treatment (even assuming she were a "pet" for purposes of California tort law).

[8] The Vaccarezzas did not attempt to prove any loss of use damages.

21

amount which will compensate for all the detriment proximately caused thereby'"]; see also Civ. Code, § 3333.)

The Vaccarezzas presented evidence Little Alexis's value depreciated $1,060,000 between 2014 and 2015. Clark stated his opinions that Little Alexis's value prior to the Breeders' Cup race was $1,500,000 and that the horse was worth the $440,000 the Vaccarezzas sold her for one year later. The problem for the Vaccarezzas is that they did not present evidence the depreciation during that year was from an injury proximately caused by Baker's negligent care. As discussed, the Vaccarezzas' malpractice theory at trial (based on Chovanes's testimony) was that Baker breached the standard of care by failing to disclose Little Alexis's hematology results and failing to advise the Vaccarezzas to scratch Little Alexis from the race and that running Little Alexis in the race caused the fever that prevented the Vaccarezzas from obtaining the health certificate necessary to fly her to Kentucky (and perhaps caused the increased inflammation in her neck that returned immediately after the race).

Even under the Vaccarezzas' theory, however, there was no substantial evidence Little Alexis's value decreased by over $1 million because she ran the Breeders' Cup race and developed the fever that prevented her from flying to Kentucky. The evidence at trial was that, within a few days after the race, Little Alexis's temperature had stabilized and she was healthy enough to fly back to Florida. No one gave an opinion on what the Vaccarezzas could have sold Little Alexis for once she returned to Florida. There was no evidence showing how much (if any) Little Alexis's value declined immediately after she ran the Breeders' Cup and recovered from the fever that caused her to miss the auction in Kentucky. The effects caused by Baker's

malpractice in November 2014—at least the effects the Vaccarezzas attempted to prove—dissipated long before the Vaccarezzas sold Little Alexa for $440,000 in October 2015.

Indeed, the Vaccarezzas' evidence was that Little Alexis's value dropped to $440,000 by October 2015, not because she had developed a fever or missed the auction, but because she never ran as well as she had prior to the Breeder's Cup. When discussing Little Alexis's depreciation in value, Clark explained that "she ran again" after the Breeders' Cup race, but that she "was never as good" and "didn't show enough."[9]

The Vaccarezzas argue there was substantial evidence Little Alexis's value had declined to $440,000 by the time she "was 'repaired' sufficiently to return to the races.'" (As discussed, Little Alexis did not race for five months after the Breeders' Cup.) The Vaccarezzas put the verdict before the evidence. First, no one testified Little Alexis's value was $440,000 when she returned to racing after five months. Clark testified that, in his opinion, Little Alexis's value was $440,000 when the Vaccarezzas sold her in October 2015 (several months after Little Alexis began racing again and was performing poorly). When counsel for the Vaccarezzas asked Clark whether he had "an opinion as to what [Little Alexis's] value was at the time she resumed racing," Clark responded: "You'd probably reduce that value [from $1.5 million]. . . . I'd say she would have been a little more difficult to sell, and you'd want to reestablish her form if your intention was to sell her." A "little bit more difficult to sell" was not substantial

---

[9] In horse racing, to "show" is to finish in third place or better. (*Panas v. Texas Breeders & Racing Assn.* (Tex.Ct.App. 1935) 80 S.W.2d 1020, 1022.)

23

evidence Little Alexis's value decreased from $1.5 million to $440,000; that's evidence of a different color.[10]

Second, even if there were substantial evidence Little Alexis's value dropped to $440,00 by the time she started racing again several months after the Breeders' Cup race, there was no substantial evidence Little Alexis was unable to race because of injuries caused by Baker's negligence. "'In *any* negligence case"—including those asserting medical (or veterinary) malpractice—"the plaintiff must present evidence from which a reasonable fact finder may conclude that defendant's conduct probably was a substantial factor in bringing about the harm." (*Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 746; see *Espinosa v. Little Co. of Mary Hospital* (1995) 31 Cal.App.4th 1304, 1313-1314.) That the malpractice was a substantial factor in causing the harm "must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima face case." (*Jameson v. Desta* (2013) 215 Cal.App.4th 1144, 1166; see *Kline v. Zimmer, Inc.* (2022) 79 Cal.App.5th 123, 129; *Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 970.)

To recover the depreciation in Little Alexis's value from before the Breeders' Cup to after she returned to racing five

---

[10] The Vaccarezzas also cite Carlo's and Van Leer's testimony as evidence Little Alexis's value decreased to $440,000 by the time she started racing. That testimony does not help the Vaccarezzas. After testifying that he sold her in 2015, Carlo stated only that Little Alexis's value was $440,000. Van Leer offered an opinion only on Little Alexis's value in October and November 2014. Neither witness testified about Little Alexis's value when she started racing again.

months later, the Vaccarezzas' would have had to show Baker's malpractice was a substantial factor in causing an injury that prevented Vaccarezza from racing for those five months. Thus, even if the Vaccarezzas proved that, but for Baker's negligent failure to disclose the hematology results, they would have scratched Little Alexis from the Breeders' Cup race, they still had to show through competent expert testimony that running Little Alexis in the Breeders' Cup race was, to a reasonable medical probability, a substantial factor in causing injuries that prevented her from racing for several months.

There was scant evidence of what injuries (if any) Little Alexis suffered that prevented her from racing for five months. Carlo testified her vein would "blow up" every time they started to increase the intensity of her training. That was pretty much it. But there was no evidence or explanation of how running Little Alexis in the Breeders' Cup race was, to a reasonable degree of medical probability, a substantial factor in causing Little Alexis's vein to "blow up" when the Vaccarezzas trained her. In fact, Chovanes testified that in his opinion Little Alexis's initial vein injury was caused by the shots Baker administered two days before the race (which, again, was not a basis of the Vaccarezzas' malpractice claim). Because the Vaccarezzas did not claim or show Baker negligently administered the shots that initially caused the vein injury, it was not enough for them to show Little Alexis continued to suffer from a vein injury after the race. Rather, the Vaccarezzas had to show that running Little Alexis in the race was a substantial factor that caused injuries that prevented her from racing. (See *Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487, 1498 ["There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease. A possible

25

cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action."].) They did not make that showing. When asked by counsel for the Vaccarezzas whether the bulge in Little Alexis's neck would have returned had she not run, Chavannes said he did not know.

At one point counsel for Vaccarezza asked Chovanes whether he had an opinion whether Little Alexis "was harmed because [she] raced." Chovanes responded that Little Alexis "had a thrombosed vein on the left side," "was lethargic," and "didn't run for five or six months after that while this whole thing was in recovery." Chovanes, however, did not explain why running Little Alexis in the Breeders' Cup race kept her from racing for five months. (See *Sanchez v. Kern Emergency Medical Transportation Corp.* (2017) 8 Cal.App.5th 146, 155 ["when an expert's opinion is purely conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion, that opinion has no evidentiary value"]; *ibid.* ["the plaintiff must offer an expert opinion that contains a reasoned explanation illuminating why the facts have convinced the expert, and therefore should convince the jury, that it is *more probable than not* the negligent act was a cause-in-fact of the plaintiff's injury"]; *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1118 [same].) Nor did Chovanes (or any other medical expert) testify it was reasonably probable Little Alexis could have returned to racing any earlier had she not run in the Breeders' Cup race, given that her vein injury developed before the race. (See *Mayes v. Bryan* (2006) 139 Cal.App.4th 1075, 1093 [to prove malpractice was a substantial factor in causing an injury, the evidence must "'allow the jury to infer that in the absence of the defendant's negligence,

26

there was a reasonable medical probabilit*y* the plaintiff would have obtained a better result'"]; *Espinosa*, *supra*, 31 Cal.App.4th at p. 1315 [same].)

## DISPOSITION

The judgment is reversed.  The trial court is directed to vacate its orders granting Baker's motion for judgment notwithstanding the verdict and denying his motion for a new trial, and enter new orders denying Baker's motion for judgment notwithstanding the verdict and granting his motion for a new trial.  The parties are to bear their costs on appeal.

SEGAL, J.

We concur:

PERLUSS, P. J.

MARTINEZ, J.